1   Kory A. Langhofer (#024722)
    Michael T. Liburdi (#021894)
2   Eric H. Spencer (#022707)
    SNELL & WILMER L.L.P.
3   One Arizona Center
    400 East Van Buren Street, Suite 1900
4   Phoenix, Arizona 85004-2202
    Telephone: (602) 382-6000
5   Attorneys for Plaintiffs

6                   IN THE UNITED STATES DISTRICT COURT

7                       FOR THE DISTRICT OF ARIZONA

8

9   MARK ORGERON, an individual,

10                          Plaintiff,              No.

11  v.                                             **VERIFIED COMPLAINT FOR
                                                   DECLARATORY AND INJUNCTIVE
12  TOWN OF QUARTZSITE, a municipal                RELIEF**
    corporation in the State of Arizona;
13  JOSE LIZARRAGA, in his official
    capacity as the ostensible mayor of the
14  Town of Quartzsite; BARBARA
    COWELL, in her official capacity as the
15  ostensible vice mayor and an ostensible
    member of the Town Council of the
16  Town of Quartzsite; PATRICIA
    ANDERSON, in her official capacity as
17  a member of the Town Council of the
    Town of Quartzsite; NORMA JEAN
18  CROOKS, in her official capacity as a
    member of the Town Council of the
19  Town of Quartzsite; MICHAEL
    JEWITT, in his official capacity as a
20  member of the Town Council of the
    Town of Quartzsite; CAROL KELLEY,
21  in her official capacity as a member of
    the Town Council of the Town of
22  Quartzsite; PATRICIA WORKMAN, in
    her official capacity as a member of the
23  Town Council of the Town of
    Quartzsite; and TERRY FRAUSTO, in
24  her official capacity as the Quartzsite
    Town Clerk,

25                          Defendants.

26

27          Plaintiff Mark Orgeron ("Orgeron") brings the following Complaint against

28  Defendants Town of Quartzsite (the "Town"), Jose Lizarraga (the "Mayor"), Barbara

*Snell & Wilmer*
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Cowell (the "Vice Mayor"), Patricia Anderson ("Anderson"), Norma Jean Crooks ("Crooks"), Michael Jewitt ("Jewitt"), Carol Kelley ("Kelley"), Patricia Workman ("Workman"), and Terry Frausto (the "Town Clerk").

## NATURE OF THE CASE

1.     On May 15, 2012, the Town held an election (the "2012 Election") for Town mayor and two seats on the Town Council.

2.     Ed Foster (the "Mayor Elect") won the election for Town mayor—but Town officials later declared that the Mayor Elect owes money to the Town and, therefore, is not qualified to serve as mayor.

3.     Plaintiff Orgeron won the election for a seat on the Town Council—but Town officials later declared that Plaintiff Orgeron had not been a resident of the Town for at least one year and, therefore, is not qualified to serve on the Town Council.

4.     The actions of the Town and its officials violate the U.S. Constitution, the Arizona Constitution, and Arizona statutes.

5.     This lawsuit seeks to restore democracy and the rule of law in the Town.

## PARTIES

6.     Plaintiff Orgeron is a qualified elector residing in the Town.  Plaintiff Orgeron was duly elected to the Town Council in the 2012 Election.  Plaintiff Orgeron promoted and voted for the Mayor Elect in the 2012 Election and, as a member of the Town Council, will work closely with the Mayor Elect to improve public policy in the Town.

7.     The Town is a municipal corporation in the State of Arizona.

8.     The Mayor was the mayor of the Town prior to the 2012 Election. Although the Mayor's term ended on the date of the 2012 Election, he purports to have continuing authority to act as the mayor of the Town.

9.     The Vice Mayor was the vice mayor of the Town prior to the 2012 Election.  Although she was defeated by Orgeron in the 2012 Election and her term ended

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

on the date of the 2012 Election, the Vice Mayor purports to have continuing authority to act as the vice mayor and a member of the Town Council.

10.     Anderson, Crooks, Jewitt, Kelley, and Workman are members of the Town Council in the Town.

11.     The Town Clerk is the clerk for the Town, and as such serves as the Town's elections official and certifies the records of the Town.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over Count I pursuant to 28 U.S.C. § 1331(a) because that claim arises under the United States Constitution and 42 U.S.C. § 1983.

13.     This Court has supplemental jurisdiction over Counts II and III pursuant to 28 U.S.C. § 1367(a) because those claims are so related to Count I that they form part of the same case or controversy.

14.     The District of Arizona is the proper venue for this action pursuant to 28 U.S.C. § 1391(b) because the defendants reside in the District of Arizona, and because a substantial part of the events or omissions giving rise to the claim occurred in the District of Arizona.

15.     The Phoenix Division of this Court is the proper intra-district venue for this action pursuant to Local Rule of Civil Procedure 77.1 because the events underlying the claims in this action occurred in La Paz County, Arizona.

16.     A justiciable controversy exists because the defendants have violated the rights of Plaintiff Orgeron arising under the U.S. Constitution, the Arizona Constitution, and Arizona statutes, both as the winner of the 2012 Election and as a supporter and Town Council ally of the Mayor Elect, and without judicial relief Plaintiff Orgeron will suffer immediate injury and loss of rights.

## FACTUAL BASIS OF CLAIMS

### Background of Plaintiff Orgeron

17.     Plaintiff Orgeron is 50 years old.

18. Plaintiff Orgeron is a resident of the Town and a qualified elector in the Town and the State of Arizona.

19. Plaintiff Orgeron is a retired member of the U.S. Navy.

20. Plaintiff Orgeron is an elementary school teacher in the Town.

**Orgeron's Residence in the Town**

21. From 1996 to July 2009, Plaintiff Orgeron lived in Yuma County, Arizona, which is adjacent to the county in which the Town is located.

22. In July 2009, Plaintiff Orgeron became a resident of the Town, and has been a resident of the Town continuously since then.

23. In July 2009, Plaintiff Orgeron moved from Yuma County, Arizona to the Holiday Palms RV Park in the Town.

24. A certified copy of Plaintiff Orgeron's invoice for the lease of space in the Holiday Palms RV Park is attached hereto as Exhibit 1.

25. When he moved to the Holiday Palms RV Park, Plaintiff Orgeron intended to stay in the Town, and had no plans to take up residence in another jurisdiction.

26. At no point since moving to the Holiday Palms RV Park has Plaintiff Orgeron intended to move from the Town or to take up residence in another jurisdiction.

27. On July 14, 2009, Plaintiff Orgeron began teaching at the Quartzsite Elementary School.

28. Plaintiff Orgeron is currently the Head Teacher at the Quartzsite Elementary School.

29. A true and correct copy of a letter from the Quartzsite School District No. 4, confirming Plaintiff Orgeron's start date at the Quartzsite Elementary School, is attached hereto as Exhibit 2.

30. On November 1, 2010, Plaintiff Orgeron purchased a home (the "Cherokee Street Home") located at 243 West Cherokee Street in the Town.

31. A notarized copy of the instrument transferring ownership of the Cherokee Street Home to Plaintiff Orgeron is attached hereto as Exhibit 3.

- 4 -

32.     When purchasing the Cherokee Street Home, Plaintiff Orgeron certified to his mortgage lender that he intended to reside in the home as his primary residence.

33.     A notarized copy of the deed of trust relating to Plaintiff Orgeron's financing of the Cherokee Street Home, which includes Plaintiff Orgeron's certification that the Cherokee Street Home would be his residence, is attached hereto as Exhibit 4.

34.     Plaintiff Orgeron moved into the Cherokee Street Home shortly after purchasing it, and has resided in the Cherokee Street Home ever since.

35.     Plaintiff Orgeron has had utilities service to the Cherokee Street Home ever since he moved in.

36.     A certified copy of Plaintiff Orgeron's water service history in the Cherokee Street Home is attached hereto as Exhibit 5.

37.     A true and correct copy of Plaintiff Orgeron's first electricity bill in the Cherokee Street Home is attached hereto as Exhibit 6.

38.     On June 28, 2011, Plaintiff Orgeron registered to vote in La Paz County, with the Cherokee Street Home listed as his residential address.

39.     A certified copy of Plaintiff Orgeron's voter registration paperwork is attached hereto as Exhibit 7.

40.     Since moving to the Town in July 2009, Plaintiff Orgeron has not voted in any other jurisdiction.

**The 2012 Election**

41.     On May 15, 2012, the Town held the 2012 Election.

42.     The mayor's seat was open and contested.

43.     Two seats for Town Council were contested, but incumbents sought reelection to both seats.

44.     Turnout for the 2012 Election was extraordinarily high for a municipal election in May.  Of the 1,514 registered voters in the Town, 719 (47.49%) voted in the 2012 Election.

45.     The Mayor Elect received the most votes for mayor.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

46.    Plaintiff Orgeron received the most votes for a seat on the Town Council.

47.    The Vice Mayor received the third-most votes for a seat on the Town Council.

48.    Joseph Winslow ("Winslow"), an incumbent member of the Town Council, received the fourth-most votes for a seat on the Town Council.

49.    A certified copy of the election results is attached hereto as Exhibit 8.

50.    Because two members of the Town Council were elected in the 2012 Election, and the Vice Mayor and Winslow received the third- and fourth-most votes for Town Council in the 2012 Election, respectively, neither Vice Mayor nor Winslow won reelection in the 2012 Election.

51.    Both the Mayor Elect and Plaintiff Orgeron were entitled to take office immediately following the 2012 Election.

52.    The terms of the Mayor, the Vice Mayor, and Winslow ended immediately following the 2012 Election.

53.    A true and correct copy of the Section 2 of the Town Code, which provides for authority to be transferred to the winner of an election on the date of the general election, is attached hereto as Exhibit 9.

**Disqualification of the Mayor Elect**

54.    On June 4, 2012, the Mayor and the Town Council held a public meeting (the "June 4th Meeting").

55.    A true and correct copy of the draft minutes of the June 4th Meeting is attached hereto as Exhibit 10.

56.    At the June 4th Meeting, the Mayor, the Vice Mayor, and Winslow each purported to exercise the powers of office, and purported to cast votes.

57.    At the June 4th Meeting, the Mayor and the Town Council voted 6-1 to disqualify the Mayor Elect.

58.    On information and belief, the basis for disqualifying the Mayor Elect was an allegation that he owed a debt to the Town, as prohibited by Town Code § 2-1-10(B).

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

59.     Town Code § 2-1-10(B) is inconsistent with the Arizona Constitution and Arizona statutes.

### Disqualification of Plaintiff Orgeron

60.     At the June 4th Meeting, the Mayor and the Town Council voted 5-2 to disqualify Plaintiff Orgeron from holding a seat on the Town Council.

61.     Although the Vice Mayor had a direct conflict of interests, as the third-place finisher in an election for two seats on the Town Council, the Vice Mayor voted to disqualify Plaintiff Orgeron and, by extension, to retain her seat on the Town Council.

62.     The basis for disqualifying Plaintiff Orgeron was an alleged failure to reside in the Town for at least one year, as required by Section 9-232(A) of the Arizona Revised Statutes and Town Code § 2-1-10(A).

63.     The Town Attorney advised the Mayor and the Town Council during the June 4th Meeting that, because Plaintiff Orgeron had not changed his voter registration from Yuma County to La Paz County until June 28, 2011, Plaintiff Orgeron had not "resided" in the Town for the requisite period of time.

64.     Before the June 4th Meeting, Plaintiff Orgeron provided to the Town Council a written explanation of, and documents proving, the facts establishing his residency in the Town since July 2009.

65.     There was no indication during the June 4th Meeting that the Mayor or the Town Council considered Plaintiff Orgeron's written submission; their discussion of external events demonstrating residency was limited to Plaintiff Orgeron's voter registration date.

66.     The disqualification of Plaintiff Orgeron was, and Ariz. Rev. Stat. § 9-232(A) and Town Code § 2-1-10(A) are, inconsistent with the U.S. Constitution, the Arizona Constitution, Arizona statutes, and local ordinance.

### June 12, 2012 Meeting

67.     The Mayor and the Town Council plan to meet and conduct official business at 9:00 in the morning on June 12, 2012 (the "June 12th Meeting").

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

68.     A true and correct copy of the public notice of the June 12th Meeting is attached hereto as Exhibit 11.

69.     The June 12th Meeting will be the first public meeting of the Mayor and the Town Council since the June 4th Meeting.

70.     On information and belief, and based on the information provided in Exhibit 11, the Mayor and the Vice Mayor will most likely purport, and Anderson, Crooks, Jewitt, Kelley, Workman, and the Town Clerk will most likely recognize the authority of the Mayor and the Vice Mayor, to exercise the powers of office at the June 12th Meeting and subsequent meetings.

## COUNT I
### 42 U.S.C. § 1983: DECLARATORY AND INJUNCTIVE RELIEF
### FOR VIOLATIONS OF FEDERAL RIGHTS
### (The Mayor, the Vice Mayor, Anderson, Crooks, Jewitt, Kelley, Workman, and the Town Clerk)

71.     The allegations set forth in the preceding paragraphs are incorporated herein by reference.

72.     Section 9-232 of the Arizona Revised Statutes and Town Code § 2-1-10(A) violate the right to travel under the Privileges and Immunities Clause and the Due Process Clause of the Fourteenth Amendment of U.S. Constitution.

73.     The Mayor, the Vice Mayor, Anderson, Crooks, Jewitt, Kelley, Workman, and the Town Clerk have either disqualified or will soon recognize the disqualification of Plaintiff Orgeron pursuant to Ariz. Rev. Stat. § 9-232 and Town Code § 2-1-10(A).

74.     In disqualifying or recognizing the disqualification of Plaintiff Orgeron, the Mayor, the Vice Mayor, Anderson, Crooks, Jewitt, Kelley, Workman, and the Town Clerk proximately caused a violation of his right to travel secured by the Privileges and Immunities Clause and the Due Process Clause of the Fourteenth Amendment of U.S. Constitution.

75. In disqualifying or recognizing the disqualification of Plaintiff Orgeron, the Mayor, the Vice Mayor, Anderson, Crooks, Jewitt, Kelley, Workman, and the Town Clerk have at all times acted as State actors and under color of state law.

76. Plaintiff Orgeron requests that this Court determine and declare his rights and interests with respect to his election to Town Council.

77. There is an actual and justifiable controversy regarding Plaintiff Orgeron's rights and interests, and such judgment or decree will terminate such uncertainty and controversy.

78. Plaintiff Orgeron therefore has a claim, and is entitled to declaratory and injunctive relief, against the Mayor, the Vice Mayor, Anderson, Crooks, Jewitt, Kelley, Workman, and the Town Clerk pursuant to 42 U.S.C. § 1983 for deprivation of federal rights under color of state law, and pursuant to 42 U.S.C. § 1988 for attorney's fees and costs.

### COUNT II
### ARIZ REV. STAT. § 12-1831 to -1832: DECLARATORY AND INJUNCTIVE RELIEF FOR MISCONSTRUCTION OF STATE LAW
### (The Town, the Mayor, the Vice Mayor, Anderson, Crooks, Jewitt, Kelley, Workman, and the Town Clerk)

79. The allegations set forth in the preceding paragraphs are incorporated herein by reference.

80. Under the Arizona Constitution, Arizona statutes, and local ordinances, Plaintiff Orgeron became a resident of the Town in July 2009—not when he transferred his voting registration from Yuma County to La Paz County in June 2011—and is therefore qualified to hold public office in the Town.

81. In disqualifying or recognizing the disqualification of Plaintiff Orgeron pursuant to Ariz. Rev. Stat. § 9-232(A) and Town Code § 2-1-10(A), or recognizing such disqualification, the Town, the Mayor, the Vice Mayor, Anderson, Crooks, Jewitt, Kelley, Workman, and the Town Clerk misapplied or will misapply the one-year

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

residency requirement in a manner that violates Plaintiff Orgeron's rights under Ariz. Rev. Stat. § 16-101(B) and other provisions of Arizona law.

82.    Such violation was proximately caused by the actions of Defendants described herein.

83.    Plaintiff Orgeron requests that this Court determine and declare his rights and interests with respect to his election to Town Council.

84.    There is an actual and justifiable controversy regarding Plaintiff Orgeron's rights and interests, and such judgment or decree will terminate such uncertainty and controversy.

85.    Plaintiff Orgeron is therefore entitled to declaratory and injunctive relief against the Town, the Mayor, the Vice Mayor, Anderson, Crooks, Jewitt, Kelley, Workman, and the Town Clerk pursuant to Ariz. Rev. Stat. § 12-1831 to -1832 for violations of rights, and pursuant to Ariz. Rev. Stat. § 12-348 for attorney's fees and costs.

### COUNT III
### ARIZ REV. STAT. § 12-1831 to -1832: DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATIONS OF STATE LAW
### (The Town, the Mayor, the Vice Mayor, Anderson, Crooks, Jewitt, Kelley, Workman, and the Town Clerk)

86.    The allegations set forth in the preceding paragraphs are incorporated herein by reference.

87.    Although Ariz. Rev. Stat. § 9-234 authorizes the Town to judge the qualifications of local candidates, the Town lacks authority to create additional qualifications for elected office.

88.    In adopting and enforcing Town Code § 2-1-10(B), which prohibits candidates for local office from owing money to the Town, the Town created additional qualifications for public office.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

89. The Town, the Mayor, the Vice Mayor, Anderson, Crooks, Jewitt, Kelley, Workman, and the Town Clerk are therefore prohibited from disqualifying or recognizing the disqualification of the Mayor Elect pursuant to Town Code § 2-1-10(B).

90. The disqualification of the Mayor Elect pursuant to Town Code § 2-1-10(B) violates the rights of Plaintiff Orgeron as a supporter of the Mayor Elect's candidacy, a voter who cast a valid ballot for the Mayor Elect in the 2012 Election, and a member of the Town Council who intends to work closely with the Mayor Elect to improve public policy in the Town.

91. Plaintiff requests that this Court determine and declare the rights and interests of Plaintiff Orgeron with respect to the 2012 Election for mayor.

92. There is an actual and justifiable controversy regarding Plaintiff's rights and interests, as a supporter of the Mayor Elect, a voter who cast a valid ballot for the Mayor Elect in the 2012 Election, and a member of the Town Council who plans to work with the Mayor Elect to improve public policy in the Town, and such judgment or decree will terminate such uncertainty and controversy.

93. Plaintiff Orgeron is therefore entitled to declaratory and injunctive relief against the Town, the Mayor, the Vice Mayor, Anderson, Crooks, Jewitt, Kelley, Workman, and the Town Clerk pursuant to Ariz. Rev. Stat. § 12-1831 to -1832 for violations of rights, and pursuant to Ariz. Rev. Stat. § 12-348 for attorney's fees and costs.

## DEMAND FOR RELIEF

WHEREFORE, the Plaintiff demands relief in the following forms:

A. a declaration of the Court pursuant to 28 U.S.C. § 2201 and Ariz. Rev. Stat. § 12-1831 to -1832 that:

    1. the durational residency requirement in Ariz. Rev. Stat. § 9-232(A) and Town Code § 2-1-10(A) violate the Privileged and Immunities Clause and the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution,

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

2.  Plaintiff Orgeron has been a resident of the Town since July 2009,

3.  the Town exceeded its authority in adopting and enforcing the additional qualifications for elected office provided in Town Code § 2-1-10(B),

4.  the Mayor Elect is qualified to be, and is, the mayor of the Town,

5.  Plaintiff Orgeron is qualified to be, and is, a member of the Town Council,

6.  the Mayor is no longer the mayor of the Town, and cannot legitimately exercise the powers of office, and

7.  the Vice Mayor is no longer the vice mayor of the Town or a member of the Town Council and cannot legitimately exercise the powers of office.

B.  an order pursuant to 28 U.S.C. § 2202 and Ariz. Rev. Stat. § 12-1801 that:

1.  prohibits the Mayor and the Vice Mayor from exercising the powers of office,

2.  prohibits the Town, Anderson, Crooks, Jewitt, Kelley, Workman, and the Town Clerk from recognizing the ostensible authority of the Mayor or the Vice Mayor, or from failing to recognize the authority of the Mayor Elect and Plaintiff Orgeron, to exercise the powers of office, and

3.  requires the Town, the Mayor, the Vice Mayor, Anderson, Crooks, Jewitt, Kelley, Workman, and the Town Clerk to recognize the authority of the Mayor Elect and Plaintiff Orgeron to exercise the powers of mayor and a member of Town Council, respectively;

C.  an award of reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988(b) and Ariz. Rev. Stat. § 12-348, the private attorney general doctrine, and other applicable law; and

D.  such other relief as the Court deems necessary, equitable, proper, or just.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

DATED this 11th day of June, 2011.

SNELL & WILMER L.L.P.


By  *s/Kory A. Langhofer*
    Kory A. Langhofer (#026276)
    Michael T. Liburdi (#021894)
    Eric H. Spencer (#022707)
    One Arizona Center
    400 East Van Buren Street, Suite 1900
    Phoenix, Arizona 85004-2202
    Attorneys for Plaintiffs


## CERTIFICATE OF SERVICE

I hereby certify that on June 11, 2012, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing.


                              *s/Kory A. Langhofer*

1

**VERIFICATION**

2    STATE OF ARIZONA      )
                          ) ss.
3    County of Maricopa    )

4

5    Mark Orgeron, being first duly sworn upon his oath, deposes and says:

6    I have read the foregoing Verified Complaint and know the contents thereof.  I know the
     allegations of the Verified Complaint to be true, except the matters stated therein on
7    information and belief, which I believe to be true.

8

9                                                    MARK ORGERON

10

11   SUBSCRIBED AND SWORN TO before me this  10TH  day of June, 2012.

12

13                     Terry Mosco
                  NOTARY PUBLIC ARIZONA
                     LA PAZ COUNTY                        NOTARY PUBLIC
                  My Commission Expires
                     April 21, 2013

14   La Az April 21-13

15   Exp

16

17

18

19

20

21

22

23

24

25

26

27

28

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

# EXHIBIT 1

# Holiday Palms RV Park

07-Jun-2012
9:21:22 AM

**PO Box 4800**
**Quartzsite, AZ 85359**
**928 927 5666  -  928 927 9271**

Receipt #:17806

MARK ORGERON
P O BOX 3055 YPG
Yuma, AZ  85365
USA

VEHICLE TYPE:

RV LIC NO:

STATE: _____   YEAR: _____

| | |
|---|---|
| NO. PERSONS | Site Number |
| | Date In:  24-Jul-2009 | C9 |
| | Date Out:  24-Jul-2010 | |

NOTICE TO GUESTS

This property is privately owned. We reserve the right to refuse service to anyone and will not be responsible for accidents nor injury to guests or for loss of money or valuables of any kind

THE MANAGEMENT

I AGREE TO READ AND COMPLY WITH ALL HOLIDAY PALMS RV PARK RULES AND REGULATIONS AS POSTED IN THE OFFICE AND/OR THE GROUNDS

X _____

Paid By: Visa - Propane

Clerk: _____

| | |
|---|---:|
| CAMPING CHARGES | $1,435.00 |
| EXTRA PERSONS | $0.00 |
| OTHER CHARGES | $651.94 |
| TAX | $11.71 |
| TOTAL CHARGES | $2,098.65 |
| ADVANCED DEP | $287.00 |
| **BALANCE** | **$1,811.65** |

**Confirmation - Invoice**

**07-Jun-2012**
**9:17:23 AM**

Holiday Palms RV Park
PO Box 4800
Quartzsite, AZ  85359
holidaypalmsrvpark@gmail.com

Client: MARK ORGERON
P O BOX 3055 YPG
Yuma, AZ  85365
USA

Bill To: MARK ORGERON
P O BOX 3055 YPG
Yuma, AZ  85365
USA

Reservation #
200901227

| Date | Description | Amount |
|------|-------------|--------|
| | 24-Jul-2009 - 24-Jul-2010 | |
| | FHU-BI - #C9 | |
| 6-Jul-2009 | 1 Yearly High Season @ $1,435.00 | $1,435.00 |
| 14-Jul-2009 | Move Rez From: Site: C3 (FHU-BI) ... Site: C9 (FHU-BI) | $0.00 |
| 28-Aug-2009 | Utility  5599- 4589= 1010 kwh from: 24-Jul to 28-Aug | $120.87 |
| 30-Sep-2009 | Utility  6428- 5599= 829 kwh from: 28-Aug to 30-Sep | $94.75 |
| 28-Oct-2009 | Utility  6681- 6428= 253 kwh from: 30-Sep to 28-Oct | $29.27 |
| 30-Nov-2009 | Utility  6925- 6681= 244 kwh from: 28-Oct to 30-Nov | $27.91 |
| 3-Dec-2009 | 1 Propane Tank @ $35.00 per year | $35.00 |
| 3-Dec-2009 | 22 Propane @ $2.68 per gallon | $58.96 |
| 30-Dec-2009 | Utility  7101- 6925= 176 kwh from: 30-Nov to 30-Dec | $22.25 |
| 27-Jan-2010 | Utility  7244- 7101= 143 kwh from: 30-Dec to 27-Jan | $19.50 |
| 16-Feb-2010 | 17.4 Propane @ $2.89 per gallon | $50.29 |
| 25-Feb-2010 | Utility  7501- 7244= 257 kwh from: 27-Jan to 25-Feb | $28.99 |
| 29-Mar-2010 | Utility  7728- 7501= 227 kwh from: 25-Feb to 29-Mar | $26.49 |
| 28-Apr-2010 | Utility  7959- 7728= 231 kwh from: 29-Mar to 28-Apr | $26.83 |
| 27-May-2010 | Utility  8256- 7959= 297 kwh from: 28-Apr to 27-May | $33.04 |
| 28-Jun-2010 | Utility  8951- 8256= 695 kwh from: 27-May to 28-Jun | $77.79 |
| | **Subtotal** | **$2,086.94** |
| | RETAIL | $7.21 |
| | RETAIL COU | $4.50 |
| | **Total** | **$2,098.65** |
| 8-Feb-2010 | Payment Received - Cash - Electric | -$19.50 |
| 10-Sep-2009 | Payment Received - Check - Electric | -$120.87 |
| 3-Oct-2009 | Payment Received - Debit Card - Electric | -$94.75 |
| 6-Jul-2009 | Payment Received - Visa | -$287.00 |
| 17-Jul-2009 | Payment Received - Visa | -$1,148.00 |
| 2-Nov-2009 | Payment Received - Visa - Electric | -$29.27 |
| 4-Dec-2009 | Payment Received - Visa - Electric | -$27.91 |
| 3-Jan-2010 | Payment Received - Visa - Electric | -$22.25 |

File: Bconfinv/V3.0.197/06.06.2003

| | Total | $2,098.65 |
|---|---|---|
| 16-Feb-2010 | Payment Received - Visa - Electric | -$54.87 |
| 5-Mar-2010 | Payment Received - Visa - Electric | -$28.99 |
| 5-Apr-2010 | Payment Received - Visa - Electric | -$26.49 |
| 5-May-2010 | Payment Received - Visa - Electric | -$26.83 |
| 1-Jun-2010 | Payment Received - Visa - Electric | -$33.04 |
| 2-Jul-2010 | Payment Received - Visa - Electric | -$77.79 |
| 4-Dec-2009 | Payment Received - Visa - Propane | -$66.09 |
| 4-Dec-2009 | Payment Received - Visa - Propane | -$35.00 |
| | **Balance Owing** | **$0.00** |

*Thank you for your patronage*

File: Bconfiav/V3.0.19700.06.2003

# Holiday Palms RV Park

**07-Jun-2012**
**9:20:49 AM**

PO Box 4800
Quartzsite, AZ 85359
928 927 5666 - 928 927 9271

Receipt #:21085

MARK ORGERON
P O BOX 3055 YPG
Yuma, AZ   85365
USA

VEHICLE TYPE:

RV LIC NO:

STATE: _____   YEAR: _____

NO. PERSONS

Site Number

Date In:  24-Jul-2010

C9

Date Out:  20-Mar-2011

### NOTICE TO GUESTS

This property is privately owned. We reserve the right to refuse service to anyone and will not be responsible for accidents nor injury to guests or for loss of money or valuables of any kind

THE MANAGEMENT

I AGREE TO READ AND COMPLY WITH ALL HOLIDAY PALMS RV PARK RULES AND REGULATIONS AS POSTED IN THE OFFICE AND/OR THE GROUNDS

X _____

Paid By: Visa - Propane

Clerk: _____

| | |
|---|---|
| CAMPING CHARGES | $1,565.00 |
| EXTRA PERSONS | $0.00 |
| OTHER CHARGES | $489.28 |
| TAX | $0.00 |
| TOTAL CHARGES | $2,054.28 |
| ADVANCED DEP | $1,565.00 |
| **BALANCE** | **$489.28** |

**Confirmation - Invoice**                                    **07-Jun-2012**
                                                              **9:18:49 AM**

Holiday Palms RV Park
PO Box 4800
Quartzsite, AZ 85359
holidaypalmsrvpark@gmail.com

Client: MARK ORGERON          Bill To: MARK ORGERON
        P O BOX 3055 YPG                P O BOX 3055 YPG
        Yuma, AZ 85365
        USA                            Yuma, AZ 85365         Reservation #
                                       USA                    201001200

| Date | Description | Amount |
|---|---|---|
| | 24-Jul-2010 - 20-Mar-2011 | |
| | FHU-BI - #C9 | |
| 5-May-2010 | 1 Yearly Mid Season @ $1,565.00 | $1,565.00 |
| 28-Jul-2010 | Utility 9977- 8951= 1026 kwh from: 24-Jul to 28-Jul | $123.18 |
| 31-Aug-2010 | Utility 10994- 9977= 1017 kwh from: 28-Jul to 31-Aug | $121.88 |
| 29-Sep-2010 | Utility 11747- 10994= 753 kwh from: 31-Aug to 29-Sep | $84.85 |
| 27-Oct-2010 | Utility 12119- 11747= 372 kwh from: 29-Sep to 27-Oct | $39.47 |
| 18-Nov-2010 | 1 Propane Tank @ $35.00 per year | $35.00 |
| 29-Nov-2010 | Utility 12305- 12119= 186 kwh from: 24-Jul to 29-Nov | $36.48 |
| 29-Dec-2010 | Utility 12433- 12305= 128 kwh from: 27-Oct to 29-Dec | $18.25 |
| 27-Jan-2011 | Utility 12544- 12433= 111 kwh from: 29-Dec to 27-Jan | $16.83 |
| 13-Feb-2011 | Utility 12613- 12544= 69 kwh from: 27-Jan to 13-Feb | $13.34 |
| 20-Mar-2011 | Moved Rez on Site # C9 From: 24-Jul - 24-Jul ... 24-Jul - 20-Mar | $0.00 |
| | **Subtotal** | **$2,054.28** |
| | **Total** | **$2,054.28** |
| 5-May-2010 | Payment Received - Visa | -$1,565.00 |
| 31-Aug-2010 | Payment Received - Visa - Electric | -$245.06 |
| 14-Oct-2010 | Payment Received - Visa - Electric | -$84.85 |
| 7-Nov-2010 | Payment Received - Visa - Electric | -$39.47 |
| 6-Mar-2011 | Payment Received - Visa - Electric | -$13.34 |
| 6-Mar-2011 | Payment Received - Visa - Electric | -$16.83 |
| 6-Mar-2011 | Payment Received - Visa - Electric | -$18.25 |
| 6-Mar-2011 | Payment Received - Visa - Electric | -$36.40 |
| 6-Mar-2011 | Payment Received - Visa - Electric | -$36.48 |
| 6-Mar-2011 | Payment Received - Visa - Propane | -$35.00 |
| 6-Mar-2011 | Reverse - Payment Received - Visa - Electric | $36.40 |
| | **Balance Owing** | **$0.00** |

*Thank you for your patronage*                    File: Bconfinv/V3.0.197/06.06.2003

## CERTIFICATE OF CUSTODIAN OF RECORDS

STATE OF ARIZONA      )

                        )    ss.

COUNTY OF _LA PAZ_   )

    Pursuant to Federal Rules of Evidence 803(6) and 902(11), I, _JUDITH M. WILLIS_ (insert full name), individually and as a representative of _HOLIDAY PALMS R.V. PARK_ (insert name of employer, hereinafter referred to as the "Custodian Organization"), declare as follows:

1.    I have personal knowledge of the facts stated in this Custodian's Certificate, I am over the age of 18 years of age, and I am of sound mind.

2.    I am a custodian of records for the Custodial Organization, and I have authority to certify the records of the Custodial Organization.

3.    In response to a request from Mark Orgeron or his representative, the Custodial Organization is producing herewith the following records (insert a particularized description of each record produced, hereinafter referred to as the "Records"):

    _PERIODS OF TIME HE WAS A RESIDENT AT THE PARK._

    _EXPENSES HE INCURED FOR UTILITIES._

4.    The Records are full, true, and correct copies of the records maintained by the Custodial Organization.

5.    The Records were made at or near the time of the acts, events, conditions, opinions, or diagnoses described therein by, or from information transmitted by, someone with knowledge of the facts set forth therein.

6.    The Records were kept in the course of a regularly conducted activity of a business, organization, occupation, or calling.

7. The making of the Records was a regular practice of that activity.

I declare under penalty of perjury that the foregoing is true and correct.

_Judith M. Willis_
Printed Name

_Judith M. Willis_
Signature

Subscribed and sworn to before me this 7th day of June, 2013

Terry Mosco
NOTARY PUBLIC ARIZONA
LA PAZ COUNTY
My Commission Expires
April 21, 2013

NOTARY PUBLIC OF AND FOR SAID STATE AND COUNTY

EXHIBIT 2

Ehrenberg Elementary School                    Quartzsite Elementary School

# QUARTZSITE SCHOOL DISTRICT #4
Post Office Box 130
49241 Ehrenberg Parker Road
Ehrenberg, Arizona  85334
(928) 923-7900        Fax:  (928) 923-8908

June 7, 2012

To Whom It May Concern:

Mr. Mark Orgeron began employment with the Quartzsite Elementary School District as a
certified, contracted Teacher as of July 14, 2009.

Respectively,

*April Whitney*

April Whitney
District Office
Payroll / Personnel
Quartzsite Elementary School District #4

EXHIBIT 3

at the request of Pioneer Title Agency, Inc.

2010-04890
Page 1 of 5
Requested By: PIONEER TITLE
SHELLY D BAKER, RECORDER
OFFICIAL RECORDS OF LA PAZ COUNTY, AZ
11-01-2010 02:42 PM Recording Fee $14.00

When recorded mail to
MARK ORGERON
CHERYL ORGERON
P.O. BOX 3055 YPG
YUMA, AZ 85365

03850635-ANR

Tax Code: 306-14-007H

3850635

SPACE ABOVE THIS LINE FOR RECORDER'S USE

# WARRANTY DEED
## Community Property With Right Of Survivorship

For the consideration of Ten Dollars, and other valuable considerations,

**CLARENCE E. DECKWA**

do/does hereby convey to

**MARK ORGERON and CHERYL ORGERON , HUSBAND AND WIFE**

not as tenants in common nor as a community property estate nor as joint tenants with right of survivorship, but as community property with right of survivorship, the following real property situated in La Paz County, Arizona, together with all rights and privileges appurtenant thereto:

**See Exhibit A attached hereto and made a part hereof.**

SUBJECT TO: Current taxes and other assessments, reservations in patents and all easements, rights of way, encumbrances, liens, covenants, conditions, restrictions, obligations, and liabilities as may appear of record.

The Grantor warrants the title against all persons whomsoever.

The Grantees by signing the acceptance below evidence their intention to acquire said premises as community property with right of survivorship.

Dated: September 16, 2010

Accepted and approved:

**SEE ATTACHED ACCEPTANCE**

_____

MARK ORGERON

_Clarence E Deckwa_

CLARENCE E. DECKWA

_____

CHERYL ORGERON

Warranty Deed CPROS - Page 1 of 3
03850635



State of  Arizona      }
                       } ss.

County of  La Paz      }

The foregoing instrument was acknowledged before me this _16th_ day of _September, 2010_, by CLARENCE E. DECKWA.

My commission expires: _May 11, 2012_

_Anita J. Romero_
NOTARY PUBLIC

OFFICIAL SEAL
ANITA J. ROMERO
Notary Public - State of Arizona
MOHAVE COUNTY
My Comm. Expires May 11, 2012

Warranty Deed CPROS - Page 2 of 3
03850635

2010-04890 11-01-2010 02:42 PM  Page 3 of 5

## Exhibit A

**PARCEL 1 as shown on Results of Survey recorded October 17, 2005, at Fee No. 2005-5967, records of La Paz County, Arizona, situate in the Northeast quarter of the Northeast quarter (NE1/4 of NE1/4) of Section 21, Township 4 North, Range 19 West of the Gila and Salt River Base and Meridian, La Paz County, Arizona.**

**EXCEPT any portion thereof lying within Cherokee Ave as set forth in instrument recorded at Fee No. 2001-131 and thereafter accepted by the Town of Quartzsite in instrument recorded at Fee No. 2001-302.**



2010-04890 11-01-2010 02:42 PM Page 4 of 5

03850635-ANR

# ACCEPTANCE OF COMMUNITY PROPERTY
# WITH RIGHT OF SURVIVORSHIP
## (Deed)

**MARK ORGERON and CHERYL ORGERON**, each being first duly sworn upon oath each for himself or herself and jointly but not one for the other deposes and says:

THAT I am one of the Grantees named in that certain Deed attached hereto and which is dated September 16, 2010 and executed by **CLARENCE E. DECKWA**, as Grantors, to **MARK ORGERON and CHERYL ORGERON**, as Grantees, and which conveys certain premises described as:

**See Exhibit A attached hereto and made a part hereof.**

to the Grantees named therein, not as Tenants in Common nor as a Community Property Estate nor as Joint Tenants with Right of Survivorship, but as Community Property with Right of Survivorship.

THAT each of us individually and jointly as Grantees hereby assert and affirm that it is our intention to accept said conveyance as Community Property with Right of Survivorship and to acquire any interest we may have in said premises under the terms of said Deed as Community Property with Right of Survivorship.

DATED: September 16, 2010

_____        _____
MARK ORGERON                              CHERYL ORGERON

State of ARIZONA          }
                          } ss.
County of LA PAZ          }

The foregoing instrument was acknowledged before me this 28th day of October, 2010, by MARK ORGERON and CHERYL ORGERON.

_____
NOTARY PUBLIC

My commission expires: MAY 11, 2012



```
              OFFICIAL SEAL
            ANITA J. ROMERO
      Notary Public - State of Arizona
            MOHAVE COUNTY
       My Comm. Expires May 11, 2012
```



2010-04890 11-01-2010 02:42 PM Page 5 of 5

## Exhibit A

PARCEL 1 as shown on Results of Survey recorded October 17, 2005, at Fee No. 2005-5967, records of La Paz County, Arizona, situate in the Northeast quarter of the Northeast quarter (NE1/4 of NE1/4) of Section 21, Township 4 North, Range 19 West of the Gila and Salt River Base and Meridian, La Paz County, Arizona.

EXCEPT any portion thereof lying within Cherokee Ave as set forth in instrument recorded at Fee No. 2001-131 and thereafter accepted by the Town of Quartzsite in instrument recorded at Fee No. 2001-302.



State of Arizona ) SS
County of La Paz )
I, Shelly D. Baker, Recorder in and for the County of La Paz, State of Arizona, do hereby certify that the foregoing attached copy, consisting of __5__ pages, is a true and correct copy of the document recorded in my office as Recording No. 2010-04890. This certification valid only if printed in purple ink. Witness my hand and official seal this date: _____

Shelly D. Baker, County Recorder
By: _____
Deputy

CPROS Acceptance - Page 2 of 2
03850635



EXHIBIT 4

Return To:
WFHM FINAL DOCS X2599-024

405 SW 5TH STREET
DES MOINES, IA 50309-4600

Prepared By:
WELLS FARGO BANK, N.A.

1150 W. WASHINGTON ST, 3RD
FLOOR, TEMPE, AZ  852811200

WE HEREBY CERTIFY THIS IS A TRUE
AND EXACT COPY OF THE ORIGINAL.

Pioneer Title Agency, Inc.

BY: _____

———————————[Space Above This Line For Recording Data]———————————

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated OCTOBER 27, 2010 ,
together with all Riders to this document.
(B) "Borrower" is MARK A ORGERON AND CHERYL L ORGERON, HUSBAND AND WIFE

Borrower is the trustor under this Security Instrument. Borrower's mailing address is
355 W MAIN ST, QUARTZSITE, AZ 85346
(C) "Lender" is WELLS FARGO BANK, N.A.

Lender is a NATIONAL ASSOCIATION
organized and existing under the laws of THE UNITED STATES
0309321321
454562773578

ARIZONA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3003  1/01 (rev. 6/02)

VMP® -6(AZ) (0208)

Page 1 of 15          Initials: _____

VMP MORTGAGE FORMS - (800)521-7291



Lender's mailing address is P.O. BOX 11701, NEWARK, NJ 071014701

Lender is the beneficiary under this Security Instrument.
(D) "Trustee" is FIRST AMERICAN TITLE INS CO

P.O. BOX 2922, PHOENIX, AZ 85062                        . Trustee's mailing address is

(E) "Note" means the promissory note signed by Borrower and dated OCTOBER 27, 2010 .
The Note states that Borrower owes Lender ONE HUNDRED EIGHTY FIVE THOUSAND AND 00/100
                                                                                    Dollars
(U.S. $ ****185,000.00      ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than NOVEMBER 01, 2040 .
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☒ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to

time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the COUNTY of LA PAZ :

       [Type of Recording Jurisdiction]                  [Name of Recording Jurisdiction]

SEE ATTACHED LEGAL DESCRIPTION MADE HERETO AND APART THEREOF.

THIS IS A PURCHASE MONEY SECURITY INSTRUMENT.
TAX STATEMENTS SHOULD BE SENT TO:   WELLS FARGO HOME MORTGAGE, P.O. BOX
11701, NEWARK, NJ   071014701

Parcel ID Number: 306-14-007H                    which currently has the address of
243 W CHEROKEE LANE                                    [Street]
QUARTZSITE                  [City], Arizona 85346       [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items

Initials: _____

VMP ®-6(AZ) (0208)                   Page 3 of 15                     Form 3003   1/01 (rev. 6/02)

pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

   **2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

   If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

   Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

   **3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4.  Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

Initials: _____

-6(AZ) (0208)        Page 10 of 15        Form 3003  1/01 (rev. 6/02)

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

Initials _____

Form 3003   1/01 (rev. 6/02)

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicers and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22.   Acceleration; Remedies.   Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise).   The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property.   The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale.   If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law.   Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold.   Trustee shall record a notice of sale in each county in which any part of the Property is located and shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law.   After the time required by Applicable Law and after publication and posting of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at the time and place designated in the notice of sale.   Trustee may postpone sale of the Property by public announcement at the time and place of any previously scheduled sale.   Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied.   The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein.   Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the county treasurer of the county in which the sale took place.

23. Release.   Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument.   Borrower shall pay any recordation costs.   Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Substitute Trustee.   Lender may, for any reason or cause, from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder.   Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. Time of Essence.   Time is of the essence in each covenant of this Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____ (Seal)
MARK A ORGERON                          -Borrower

_____

_____ (Seal)
CHERYL L ORGERON                        -Borrower

_____ (Seal)        _____ (Seal)
-Borrower                                       -Borrower

_____ (Seal)        _____ (Seal)
-Borrower                                       -Borrower

_____ (Seal)        _____ (Seal)
-Borrower                                       -Borrower

-6(AZ) (0206)                   Page 14 of 16                   Form 3003   1/01 (rev. 6/02)

STATE OF ARIZONA, LA PAZ                    *LA PAZ*   County ss:

    The foregoing instrument was acknowledged before me this   *28th Day of October, 2010*
by MARK A ORGERON AND CHERYL L ORGERON



                                     OFFICIAL SEAL
                                   ANITA J. ROMERO
                       Notary Public - State of Arizona
My Commission Expires:   *MAY 11, 2012*       MOHAVE COUNTY
                       My Comm. Expires May 11, 2012

                                *Anita J Romero*
                        Notary Public

TB

EXHIBIT "A"

**PARCEL 1 as shown on Results of Survey recorded October 17, 2005, at Fee No. 2005-5967, records of La Paz County, Arizona, situate in the Northeast quarter of the Northeast quarter (NE1/4 of NE1/4) of Section 21, Township 4 North, Range 19 West of the Gila and Salt River Base and Meridian, La Paz County, Arizona.**

**EXCEPT any portion thereof lying within Cherokee Ave as set forth in instrument recorded at Fee No. 2001-131 and thereafter accepted by the Town of Quartzsite in instrument recorded at Fee No. 2001-302.**

Record and Return [ ] by Mail [ ] by Pickup to:

WFHM FINAL DOCS X2599-024

405 SW 5TH STREET
DES MOINES, IA 50309-4600

## MANUFACTURED HOME RIDER TO SECURITY INSTRUMENT

This Rider is made this ___OCTOBER 27, 2010___ and is incorporated into and amends and supplements the Mortgage, Open-End Mortgage, Deed of Trust, or Credit Line Deed of Trust, Security Deed ("Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Note to __WELLS FARGO BANK, N.A.__

_____ ("Lender") of the same date ("Note") and covering the Property described in the Security Instrument and located at:
243 W CHEROKEE LANE, QUARTZSITE, AZ 85346

(Property Address)

Borrower and Lender agree that the Security Instrument is amended and supplemented to read as follows:

1. **Meaning of Some Words.** As used in this Rider, the term "Loan Documents" means the Note, the Security Instrument and any Construction Loan Agreement, and the term "Property", as that term is defined in the Security Instrument, Includes the "Manufactured Home" described in paragraph 3 of this Rider. All terms defined in the Note or the Security Instrument shall have the same meaning in this Rider.

2. **Purpose and Effect of Rider.** IF THERE IS A CONFLICT BETWEEN THE PROVISIONS IN THIS RIDER AND THOSE IN THE SECURITY INSTRUMENT, THE PROVISIONS IN THIS RIDER SHALL CONTROL. THE CONFLICTING PROVISIONS IN THE SECURITY INSTRUMENT WILL BE ELIMINATED OR MODIFIED AS MUCH AS IS NECESSARY TO MAKE ALL OF THE CONFLICTING TERMS AGREE WITH THIS RIDER.

3. **Lender's Security Interest.** All of Borrower's obligations secured by the Security Instrument also shall be secured by the Manufactured Home:

| USED | 2002 | SKYLINE HOMES | OAK 9717CT | 057 X 027 |
|------|------|---------------|------------|-----------|
| New/Used | Year | Manufacturer's Name | Model Name or Model No. | Length x Width |

| 06710573PA | 06710573PB | | |
|------------|------------|--|--|
| Serial No. | Serial No. | Serial No. | Serial No. |

Page 1          Initial 

NMFL # 7109 (MAHR) Rev 2/4/2008

4.   **Affixation.** Borrower covenants and agrees:
     (a) to affix the Manufactured Home to a permanent foundation on the Property;
     (b) to comply with all Applicable Law regarding the affixation of the Manufactured Home
         to the Property;
     (c) upon Lender's request, to surrender the certificate of title to the Manufactured Home, if
         surrender is permitted by Applicable Law, and to obtain the requisite governmental
         approval and documentation necessary to classify the Manufactured Home as real
         property under Applicable Law;
     (d) that affixing the Manufactured Home to the Property does not violate any zoning laws or
         other local requirements applicable to the Property;
     (e) that the Manufactured Home will be, at all times and for all purposes, permanently affixed
         to and part of the Property.

5.   **Charges; Liens.** Section 4, Paragraph 1 of the Security Instrument is amended to add a new
     third sentence to read:
         Borrower shall promptly furnish to Lender all notices of amounts to be paid under this
         paragraph and receipts evidencing the payments.

6.   **Property Insurance.** Section 5, Paragraph 1 of the Security Instrument is amended to add a
     new second sentence to read:
         Whenever the Manufactured Home is transported on the highway, Borrower must
         have trip insurance.

7.   **Notices.** The second sentence of Section 15 of the Security Instrument is amended by
     inserting the words "unless otherwise required by law" at the end.

8.   **Additional Events of Default.** Borrower will be in default under the Security Instrument:
     (a) if any structure on the Property, including the Manufactured Home, shall be removed,
         demolished, or substantially altered;
     (b) if Borrower fails to comply with any requirement of Applicable Law (Lender, however,
         may comply and add the expense to the principal balance Borrower owes to Lender); or
     (c) if Borrower grants or permits any lien on the Property other than Lender's lien, or liens for
         taxes and assessments that are not yet due and payable.

9.   **Notice of Default.** If required by Applicable Law, before using a remedy, Lender will send
     Borrower any notice required by law, and wait for any cure period that the law may require
     for that remedy.

10.  **Additional Rights of Lender in Event of Foreclosure and Sale.** In addition to those rights
     granted in the Note and Security Instrument, Lender shall have the following rights in the
     event Lender commences proceedings for the foreclosure and sale of the Property.
     (a) At Lender's option, to the extent permitted by Applicable Law, Lender may elect to treat
         the Manufactured Home as personal property ("Personal Property Collateral"). Lender
         may repossess peacefully from the place where the Personal Property Collateral is located
         without Borrower's permission. Lender also may require Borrower to make the Personal
         Property Collateral available to Lender at a place Lender designates that is reasonably
         convenient to Lender and Borrower. At Lender's option, to the extent permitted by
         Applicable Law, Lender may detach and remove Personal Property Collateral from the
         Property, or Lender may take possession of it and leave it on the Property. Borrower
         agrees to cooperate with Lender if Lender exercises these rights.

     (b) After Lender repossesses, Lender may sell the Personal Property Collateral and apply the
         sale proceeds to Lender's reasonable repossession, repair, storage, and sale expenses,
         and then toward any other amounts Borrower owes under the Loan Documents.

(c) In the event of any foreclosure sale, whether made by Trustee, or under judgment of a court, all of the real and Personal Property Collateral may, at the option of Lender, be sold as a whole or in parcels. It shall not be necessary to have present at the place of such sale the Personal Property Collateral or any part thereof. Lender, as well as Trustee on Lender's behalf, shall have all the rights, remedies and recourse with respect to the Personal Property Collateral afforded to a "Secured Party" by Applicable Law in addition to, and not in limitation of, the other rights and recourse afforded Lender and/or Trustee under the Security Instrument.

By signing below, Borrower accepts and agrees to the terms and covenants contained in this Rider.

WITNESS my hand and seal this ___28th___ day of ___October, 2010___.

| | |
|---|---|
| Borrower | Borrower |
| MARK A ORGERON | CHERYL L ORGERON |
| | |
| Borrower | Borrower |
| | |
| Borrower | Borrower |
| | |
| Borrower | Borrower |

STATE OF ___ARIZONA___ )
                                          ) ss.:
COUNTY OF ___LA PAZ___ )

On the ___28th___ day of ___October___ in the year ___2010___ before me, the undersigned, a Notary Public in and for said State, personally appeared ___Mark A. Orgeron          Cheryl L. Orgeron___, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is(are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person on behalf of which the individual(s) acted, executed the instrument.

___Anita J Romero___                    ___Anita J. Romero___
Notary Signature                              Notary Printed Name

Notary Public, State of ___ARIZONA___         Qualified in the County of ___MOHAVE___

My Commission expires: ___May 11, 2012___

Official Seal:

OFFICIAL SEAL
ANITA J. ROMERO
Notary Public - State of Arizona
MOHAVE COUNTY
My Comm. Expires May 11, 2012

Drafted By: **LAURA FLEMING**                    [ ] Check if Construction Loan

## VA GUARANTEED LOAN AND ASSUMPTION POLICY RIDER

# NOTICE: THIS LOAN IS NOT ASSUMABLE WITHOUT THE APPROVAL OF THE DEPARTMENT OF VETERANS AFFAIRS OR ITS AUTHORIZED AGENT.

THIS VA GUARANTEED LOAN AND ASSUMPTION POLICY RIDER is made this 27TH           day of OCTOBER, 2010                              , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Deed to Secure Debt (herein "Security Instrument") dated of even date herewith, given by the undersigned (herein "Borrower") to secure Borrower's Note to WELLS FARGO BANK, N.A.

(herein "Lender") and covering the Property described in the Security Instrument and located at 243 W CHEROKEE LANE, QUARTZSITE, ARIZONA  85346

[Property Address]

VA GUARANTEED LOAN COVENANT: In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

If the indebtedness secured hereby be guaranteed or insured under Title 38, United States Code, such Title and Regulations issued thereunder and in effect on the date hereof shall govern the rights, duties and liabilities of Borrower and Lender. Any provisions of the Security Instrument or other instruments executed in connection with said indebtedness which are inconsistent with said Title or Regulations, including, but not limited to, the provision for payment of any sum in connection with prepayment of the secured indebtedness and the provision that the Lender may accelerate payment of the secured indebtedness pursuant to Covenant 18 of the Security Instrument, are hereby amended or negated to the extent necessary to conform such instruments to said Title or Regulations.

454562773578

**MULTISTATE VA GUARANTEED LOAN AND ASSUMPTION POLICY RIDER**

**VMP**®-538R (0310)                                   10/03
Page 1 of 3                         Initials
VMP Mortgage Solutions (800)521-7291

LATE CHARGE: At Lender's option, Borrower will pay a "late charge" not exceeding four per centum (4%) of the overdue payment when paid more than fifteen (15) days after the due date thereof to cover the extra expense involved in handling delinquent payments, but such "late charge" shall not be payable out of the proceeds of any sale made to satisfy the indebtedness secured hereby, unless such proceeds are sufficient to discharge the entire indebtedness and all proper costs and expenses secured hereby.

GUARANTY: Should the Department of Veterans Affairs fail or refuse to issue its guaranty in full amount within 60 days from the date that this loan would normally become eligible for such guaranty committed upon by the Department of Veterans Affairs under the provisions of Title 38 of the U.S. Code "Veterans Benefits," the Mortgagee may declare the indebtedness hereby secured at once due and payable and may foreclose immediately or may exercise any other rights hereunder or take any other proper action as by law provided.

TRANSFER OF THE PROPERTY: This loan may be declared immediately due and payable upon transfer of the property securing such loan to any transferee, unless the acceptability of the assumption of the loan is established pursuant to Section 3714 of Chapter 37, Title 38, United States Code.

An authorized transfer ("assumption") of the property shall also be subject to additional covenants and agreements as set forth below:

(a) ASSUMPTION FUNDING FEE: A fee equal to       one-half of one percent       (  0.5   %) of the balance of this loan as of the date of transfer of the property shall be payable at the time of transfer to the loan holder or its authorized agent, as trustee for the Department of Veterans Affairs. If the assumer fails to pay this fee at the time of transfer, the fee shall constitute an additional debt to that already secured by this instrument, shall bear interest at the rate herein provided, and, at the option of the payee of the indebtedness hereby secured or any transferee thereof, shall be immediately due and payable. This fee is automatically waived if the assumer is exempt under the provisions of 38 U.S.C. 3729 (c).

(b) ASSUMPTION PROCESSING CHARGE: Upon application for approval to allow assumption of this loan, a processing fee may be charged by the loan holder or its authorized agent for determining the creditworthiness of the assumer and subsequently revising the holder's ownership records when an approved transfer is completed. The amount of this charge shall not exceed the maximum established by the Department of Veterans Affairs for a loan to which Section 3714 of Chapter 37, Title 38, United States Code applies.

(c) ASSUMPTION INDEMNITY LIABILITY: If this obligation is assumed, then the assumer hereby agrees to assume all of the obligations of the veteran under the terms of the instruments creating and securing the loan. The assumer further agrees to indemnify the Department of Veterans Affairs to the extent of any claim payment arising from the guaranty or insurance of the indebtedness created by this instrument.

IN WITNESS WHEREOF, Borrower(s) has executed this VA Guaranteed Loan and Assumption Policy Rider.

_____ -Borrower
MARK A ORGERON

_____ -Borrower
CHERYL L ORGERON

_____ -Borrower

_____ -Borrower

_____ -Borrower

_____ -Borrower

_____ -Borrower

_____ -Borrower

VMP-538R (0310)                      Page 3 of 3

EXHIBIT 5

Town of Quartzsite

Customer History
Report Dates: 10/01/2010 - 06/30/2012

Page:  1

Jun 08, 2012  10:16AM

Report Criteria:
　Customer.Customer number = ▉ ▉

▉ ▉　　Orgeron, Mark & Cheryl　　　243 W Cherokee Ln

Account Summary:

| Period | WUse | WBase | SBase | Sewer | WA Tax | Sales Tax | Pnlty | Billings | Billing Adjustments | Payments | Other | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 09/30/2010 | | | | | | | | | | | | - |
| 10/31/2010 | - | - | - | - | - | - | - | - | - | - | - | - |
| 11/30/2010 | 3.46 | 20.80 | 21.75 | 6.00 | .12 | 2.45 | - | 54.58 | - | - | - | 54.58 |
| 12/31/2010 | 9.28 | 20.80 | 21.75 | 6.00 | .33 | 3.04 | 15.00 | 76.20 | - | - | - | 130.78 |
| 01/31/2011 | 8.55 | 20.80 | 21.75 | 6.00 | .31 | 2.96 | - | 60.37 | - | 130.78 - | - | 60.37 |
| 02/28/2011 | 7.46 | 20.80 | 21.75 | 6.00 | .27 | 2.85 | - | 59.13 | - | 60.37 - | - | 59.13 |
| 03/31/2011 | 11.61 | 27.04 | 31.50 | 7.25 | .32 | 3.63 | - | 81.35 | - | 59.13 - | - | 81.35 |
| 04/30/2011 | 8.30 | 27.04 | 31.50 | 7.25 | .27 | 3.57 | - | 77.93 | - | 81.35 - | - | 77.93 |
| 05/31/2011 | 10.19 | 27.04 | 31.50 | 7.25 | .33 | 3.76 | 15.00 | 95.07 | - | - | - | 173.00 |
| 06/30/2011 | 8.77 | 27.04 | 31.50 | 7.25 | .24 | 3.62 | - | 78.42 | - | 173.00 - | - | 78.42 |
| 07/31/2011 | 8.53 | 27.04 | 31.50 | 7.25 | .23 | 3.59 | - | 78.14 | - | 78.42 - | - | 78.14 |
| 08/31/2011 | 7.35 | 27.04 | 31.50 | 7.25 | .20 | 3.47 | - | 76.81 | - | 78.14 - | - | 76.81 |
| 09/30/2011 | 6.40 | 27.04 | 31.50 | 7.25 | .18 | 3.38 | 15.00 | 90.75 | - | - | - | 167.56 |
| 10/31/2011 | 7.11 | 27.04 | 31.50 | 7.25 | .20 | 3.45 | - | 76.55 | - | 191.81 - | - | 52.30 |
| 11/30/2011 | 6.87 | 27.04 | 31.50 | 7.25 | .19 | 3.42 | - | 76.27 | - | 52.30 - | - | 76.27 |
| 12/31/2011 | 10.43 | 27.04 | 31.50 | 7.25 | .29 | 3.97 | 15.00 | 95.48 | - | 91.27 - | - | 80.48 |
| 01/31/2012 | 10.87 | 27.04 | 31.50 | 7.25 | .29 | 4.00 | 15.00 | 95.75 | - | 100.00 - | - | 76.23 |
| 02/29/2012 | 7.35 | 27.04 | 31.50 | 7.25 | .20 | 3.65 | - | 76.99 | - | 76.23 - | - | 76.99 |
| 03/31/2012 | 6.16 | 27.04 | 31.50 | 7.25 | .17 | 3.52 | 15.00 | 90.64 | - | 76.99 - | - | 90.64 |
| 04/30/2012 | 7.82 | 27.04 | 31.50 | 7.25 | .21 | 3.70 | 15.00 | 92.52 | - | - | - | 183.16 |
| 05/31/2012 | 10.19 | 27.04 | 31.50 | 7.25 | .28 | 3.95 | - | 80.21 | - | 200.00 - | - | 63.37 |
| 06/30/2012 | - | - | - | - | - | - | - | - | - | - | - | 53.37 |
| Totals: | 156.50 | 488.60 | 559.50 | 132.75 | 4.63 | 65.98 | 105.00 | - | 1,513.16 | - | 1,449.79 - | - |



243 W CHEROKEE LN                    06/08/12

    For Service From 11/01/2010 to 11/30/10

| | | | | |
|---|---|---|---|---|
| PREV. BAL. | | | | .00 |
| PAYMENTS 05/07/12 | | | | .00 |
| ADJ. | | | | .00 |
| WATER USA 11/22/10 | 1,479 | 1,498 | 19 | 3.46 |
| WATER BASE | | | | 20.80 |
| SEWER BASE | | | | 21.75 |
| SEWER - RV | | | | 6.00 |
| WATER TAX | | | | .12 |
| SALES TAX | | | | 2.45 |

Due By 12/20/10

 54.58

ORGERON, MARK & CHERYL
PO BOX 384

QUARTZSITE  AZ  85346

    12/20/10            69.58            54.58

Commercial Sewer Customers can still opt for Volumetric
rates contact the Utility Dept for more info!



State of Arizona                    )

County of La Paz                    )

I, Jennifer Nunez , a notary public, do certify that, on

the 8th day of June , 20 12, I personally made the

above/attached copy of Customer History utility Dept. from the
Town of Quartzsite

original, and it is a true, exact, complete, and unaltered copy.

(seal)

Jennifer Nunez

OFFICIAL SEAL
JENNIFER NUNEZ
NOTARY PUBLIC - STATE OF ARIZONA
LA PAZ COUNTY
My Comm. Expires September 22, 2014

Notary Public

State of Arizona )
County of La Paz )

I, Jennifer Nunez , a notary public, do certify that, on
the 8th day of June , 2012, I personally made the
above/attached copy of Utility Bill Service Dates 11/01/10 thru 11/30/10 from the

original, and it is a true, exact, complete, and unaltered copy.

(seal)

Jennifer Nunez

Notary Public

OFFICIAL SEAL
JENNIFER NUNEZ
NOTARY PUBLIC - STATE OF ARIZONA
LA PAZ COUNTY
My Comm. Expires September 22, 2014

EXHIBIT 6

# Your electricity bill

Bill date: November 18, 2010

## Summary of what you owe

| | | |
|---|---|---:|
| | Amount owing on your previous bill | $0.00 |
| Less | Payments made through Nov 18 | $0.00 |
| Equals | Your balance forward | $0.00 |
| Plus | Your new charges (details on following pages) | |
| | Cost of electricity (with taxes and fees) | $59.30 |
| | Other charges | $27.51 |
| Equals | Total amount due | $86.81 |

### Due date: December 3, 2010

**Mark A Orgeron**
**Cheryl L Orgeron**

Your account number: ▮▮▮▮▮

For service at: 243 W Cherokee Ln

**Questions or Office Locations?**
Call 928-669-2248 or 1-800-253-9405,
24 hours a day
Website: aps.com
Para servicio en español llame al:
602-371-6861 (Phoenix) o
1-800-252-9410 (Otras areas)

### Deck the Halls with LED Lights

The Holiday Light Calculator at
aps.com/LED can help you save energy
and money this holiday season. LED
holiday lights use about 90 percent less
energy than traditional incandescent
holiday lights and last much longer. They
also operate at a much cooler temperature
and can be conveniently strung in longer
strands since they use so little energy.

See how much you could save at
aps.com/LED.

---

Page 1 of 4     See page 2 for more information.



| Your account number | Bill date |
|---|---|
| ▮▮▮▮▮ | November 18, 2010 |

☐ Mailing address or phone number change?
Check here and fill in the details on the back.

MARK A ORGERON
CHERYL L ORGERON
PO BOX 3055
YUMA PROVING GRO AZ 85365-0900

When paying in person, please
bring the bottom portion of your bill.

| Total amount due: | $ | 86.81 |
|---|---|---|

Your optional contribution
to SHARE:    $_____

Total amount paid:    $_____

Due date:    Dec 3, 2010

**Please make your check payable to APS**
and write your account number on your check.
To ensure proper credit, please enclose the
bottom portion of your bill with your payment.

X



## News from APS

**Eliminating envelopes helps the environment**

If you did not receive a payment envelope with your bill, congratulations! You have been paying your APS bill online, by phone, through AutoPay or SurePay -- eliminating the need for a return envelope and that saves paper, postage and fuel. Thank you for helping us take care of the environment. To find out more about our easy-to-use, environmentally-friendly payment options, visit aps.com/waystopay. If you need to receive an envelope, make one payment through the US mail and an envelope will be automatically included beginning with your next statement.

## Things you need to know

**Contacting APS**
- E-mail us at aps@aps.com
- Call us at:
  602-371-7171 (Phoenix) or 800-253-9405 (Other areas)
  24 hours a day
- Para servicio en español llame al:
  602-371-6861 (Phoenix) o 1-800-252-9410 (Otras areas)
- Hearing impaired:
  Dial 711 - AZ Relay Service
- By mail: APS, Station 3200, PO Box 53933,
  Phoenix AZ 85072-3933
- Blue Stake - Before you dig, call:
  811 or 800-782-5348 from anywhere within Arizona
- Electrical emergencies other than power outages, call
  602-258-5483 (Phoenix) or 800-253-9408 (Other areas)

**Important billing and collection information**

Make checks payable to APS and mail to:
APS, PO Box 2906, Phoenix AZ 85062-2906

Credit and Collections:
602-371-7607 (Phoenix) or 1-800-253-9409 (Other areas)

All bills for utility services are due and payable no later than 15 days from the date of the bill. Any payments not received within this time-frame shall be considered delinquent and are subject to a late payment charge of 1.5% per month.

If your power is shut off for non-payment, you must pay all the delinquent amounts and a deposit or additional deposit before power is restored.

When you provide a check as payment, you authorize us either to use information from your check to make a one-time electronic funds transfer from your account or to process the payment as a check transaction. When we process your check electronically you will not receive your check back from your financial institution and funds may be withdrawn from your account on the same day we receive your payment.

**Utility regulations and rates (Not an APS payment site)**

Electricity regulations and rates are approved by:
Arizona Corporation Commission,
1200 W Washington, Phoenix AZ 85007
602-542-4251 (Phoenix) or 1-800-222-7000 (Other areas).
www.cc.state.az.us

Page 2 of 4

**Sign up for SurePay Automatic Payments!**

Mark A Orgeron                    Phone (        )

Optional SHARE Contribution to be added to my Monthly Bill ($1 to $9) $____

My signature authorizes APS to electronically debit my bank account on the billing due date to pay the total amount due each month. Use the enclosed check payment to set up automatic payments. To terminate SurePay, I will contact APS. (Intended for mailed-in payments only. No counter checks.)

Signature:

**Mailing address or phone number change**

First name, middle name, last name

Address (number, street name)

City                         State            Zip + 4

Home phone                   Business phone

(        )                    (        )



PO BOX 2906
PHOENIX AZ 85062-2906

X

Your electricity bill
November 18, 2010

Mark A Orgeron
Cheryl L Orgeron

Your account number

Your service plan: Standard Rate

Meter number
Meter reading cycle: 12

# Charges for electricity services

## Cost of electricity you used

| | |
|---|---|
| Basic service charge | $1.01 |
| Delivery service charge | $18.85 |
| Environmental benefits surcharge | $2.69 |
| Federal environmental improvement surcharge | $0.08 |
| System benefits charge | $1.07 |
| Power supply adjustment* | -$2.28 |
| Metering* | $1.44 |
| Meter reading* | $0.99 |
| Billing* | $1.12 |
| Generation of electricity* | $25.18 |
| Transmission and ancillary services* | $2.64 |
| Transmission cost adjustment* | $1.09 |
| Cost of electricity you used | $53.88 |

## Taxes and fees

| | |
|---|---|
| Regulatory assessment | $0.16 |
| State sales tax | $3.64 |
| County sales tax | $0.55 |
| City sales tax | $0.00 |
| Franchise fee | $1.07 |
| Cost of electricity with taxes and fees | $59.30 |

## Other charges and credits

| | |
|---|---|
| Service establishment charge 11/01/2010 | $27.51 |
| Total other charges and credits | $27.51 |

Total charges for electricity services — $86.81

\* These services are currently provided by APS but may be provided by
a competitive supplier.

# Amount of electricity you used

| | |
|---|---|
| Meter reading on Nov 17 | 57757 |
| Meter reading on Nov 1 | 57249 |
| Total electricity you used, in kWh | 508 |

## Comparing your monthly use

| | This month | Last month | This month last year |
|---|---|---|---|
| Billing days | 16 | N/A | N/A |
| Average outdoor temperature | 67° | N/A | N/A |
| Your total use in kWh | 508 | N/A | N/A |
| Your average daily cost | $3.70 | N/A | N/A |

X



## Glossary of Terms

**Basic service charge** – The minimum charge for having service available, whether you used electricity or not.

**Billing** – The cost of calculating and providing your monthly statement.

**Delivery service charge** – A charge, based on your kWh usage and/or kW demand, to build and operate the equipment for delivering electricity to your home including lines, poles, transformers and substations.

**Environmental benefits surcharge** – A charge to cover the costs of programs approved by the Arizona Corporation Commission, including: energy efficiency and renewable energy projects.

**Federal Environmental Improvement Surcharge** – A charge to recover a portion of the cost of investments and expenses for environmental improvements at APS' generation facilities designed to comply with environmental standards mandated by federal laws or regulations.

**Franchise fee** – A charge by a municipality for APS' use of the public rights-of-way for its facilities.

**Generation of electricity** – The cost of producing the electricity you used this month.

**Interim Rate Surcharge** – An increase to APS base rates approved by the Arizona Corporation Commission. Funds collected through this surcharge are subject to refund pending the outcome of APS current rate case.

**Meter reading** – A fixed fee to determine your energy use.

**Metering** – A fixed fee for providing and servicing the meter.

**Power supply adjustment** – An adjustment mechanism to recover fluctuations in fuel and purchased power costs.

**Regulatory assessment** – A cost imposed on customers of state-regulated utilities to help fund the Arizona Corporation Commission and Residential Utility Consumer's Office.

**Systems benefits charge** – A charge to cover the costs of programs approved by the Arizona Corporation Commission, including low-income assistance, demand side management, customer education, environmental, renewables, long-term public benefit research and development, nuclear fuel disposal and nuclear power plant decommissioning programs as well as other programs approved by the Commission.

**Transmission and ancillary services** – The cost for moving high voltage electricity from generating facilities and other sources to the APS distribution lines.

X

EXHIBIT 7

[1] Permanent Early Voting List – Early Ballot (see instructions above)
■ YES, I want to automatically receive an early ballot for each election for which I am eligible.
☐ NO, I DO NOT want to automatically receive an early ballot. I understand CHECKING THIS BOX will remove my name from the list if it was previously included.

BOX FOR OFFICE USE ONLY    7 - 14514

| [2] Last Name | First Name | Middle Name | Jr./Sr./III |
|---|---|---|---|
| ORGERON | MARK | A | |

[3] Address where you live – If no street address, describe residence location using mileage, cross streets, parcel #, subdivision name and lot, or landmarks.
Do not use post office box or business address. Draw a map below if located in rural area.

243 W CHEROKEE LN

| [5] City | [6] Zip | [7] Address where you get your mail, If mail is not delivered to your home | [4] Apt./Unit/Space |
|---|---|---|---|
| QUARTZSITE | 85346 | PO BOX 384 , QUARTZSITE , AZ 85346 | |

| [8] Last four digits of Social Security Number | [9] AZ Driver License Number or AZ Nonoperating License Number | [10] Optional Tribal Identification Number | [11] Alien Registration Number |
|---|---|---|---|
| | D02577752 | | |

| [12] Birth Date (MM/DD/YYYY) | [13] State or Country of Birth | [14] Specify Party Preference | [15] Telephone number | [16] Occupation |
|---|---|---|---|---|
| 08/17/1961 | LA | REPUBLICAN | 928-210-2454 | PROF.EDUCATORS |

| [17] Are you registered to vote at another address?   Yes ■   No ☐   Not Sure☐ List the former address, including county and state | [18] List former name (if applicable) | [19] Father's name or mother's maiden name |
|---|---|---|
| YUMA | | ORGERON |

[20] Will you be willing to work at a polling place on election day?   Yes ■   No☐

[21]  • Are you a citizen of the United States of America?   Yes ■   No ☐
      • Will you be 18 years of age on or before election day?   Yes ■   No ☐

*If you checked 'No' to either one of these questions, do not submit this form.*

VOTER DECLARATION – By signing below, I swear or affirm that the above information is true, that I am a RESIDENT of Arizona, I am NOT a convicted FELON or my civil rights are restored, and I have NOT been adjudicated INCOMPETENT.

This is a printed representation of the completed ServiceArizona web form 201106280815090001

X _(signature)_

SIGN HERE                                           06/28/2011
                                                    DATE

[22] If no street address draw a map here:

                    N

W ————————————— E

                    S

RECEIVED JUN 29 2011

[23] If you are unable to sign the form, the form can be completed at your direction. The person who assisted you must sign here.
SIGNATURE OF PERSON ASSISTING                       DATE





# La Paz County Recorder

1112 Joshua Avenue, Suite 201
Parker, Arizona 85344
(928) 669-6136
Fax (928) 669-5638
www.co.la-paz.az.us

Shelly D. Baker
Recorder

Richard Garcia
Office Administrator

Kevin Scholl
Voter Registration Coordinator

Cindie Douglas
Recording Clerk

## CERTIFICATION

I, **Shelly Baker**, County Recorder in and for La Paz County, State of Arizona, hereby certify that this is a copy of the original official Affidavit of Registration to vote contained in the official files of La Paz County, Arizona as provided for and required under Title 16, Arizona Revised Statutes.

Witness my hand and seal this _7th Day of June 2012_



**Shelly Baker, La Paz County Recorder**

By _Shelly Baker_

# EXHIBIT 8

Election Summary Report
Town of Quartzsite
Runoff Election - May 15, 2012

Date:05/21/12
Time:14:57:32
Page:1 of 1

Summary For Jurisdiction Wide, All Counters, All Races
TOWN OF QUARTZSITE GENERAL ELECTION
FINAL UNOFFICIAL RESULTS
ALL BALLOTS COUNTED

Registered Voters 1514 - Cards Cast 719   47.49%          Num. Report Precinct 1 - Num. Reporting 1   100.00%

| Mayor | Total | |
|---|---|---|
| Number of Precincts | 1 | |
| Precincts Reporting | 1 | 100.0 % |
| Times Counted | 719/1514 | 47.5 % |
| Total Votes | 712 | |
| FOSTER, ED | 401 | 56.32% |
| LUKKASSON, JERRY | 305 | 42.84% |
| Write-in Votes | 6 | 0.84% |

| Council Member | Total | |
|---|---|---|
| Number of Precincts | 1 | |
| Precincts Reporting | 1 | 100.0 % |
| Times Counted | 719/1514 | 47.5 % |
| Total Votes | 1371 | |
| COWELL, BARBARA A. | 305 | 22.25% |
| ORGERON, MARK | 398 | 29.03% |
| WINSLOW, JOE | 264 | 19.26% |
| WORKMAN, PATRICIA | 387 | 28.23% |
| Write-in Votes | 17 | 1.24% |



# La Paz County Board of Supervisors

### 1108 Joshua Avenue
### Parker, Arizona 85344

(928) 669-6115          TDD (928) 669-8400          Fax (928) 669-9709

| | | | |
|---|---|---|---|
| Sandy Pierce | - District 1 | Dan Field | - County Administrator |
| John Drum | - District 2 | Donna J. Hale | - Clerk of the Board |
| Holly Irwin | - District 3 | | |

**STATE OF ARIZONA**     )
                         ) ss.
**COUNTY OF LA PAZ**     )

    I, *Donna J. Hale, Clerk of the Board of Supervisors,* do hereby certify that I am required by law to maintain custody of the official records of *La Paz County* and that the attached is a true and correct copy of:

## FINAL UNOFFICIAL RESULTS FOR THE TOWN OF QUARTZSITE GENERAL ELECTION OF MAY 15, 2012

                               In Witness Whereof I have hereunto set my hand and affix the official seal of La Paz County this **7th** day of **June, 2012.**

Donna J. Hale, Clerk of the Board
La Paz County, Arizona

forms.certification doc.doc

EXHIBIT 9

# CHAPTER 2   MAYOR & COUNCIL

ARTICLE   2-1   COUNCIL

2-1-1      Elected Officers
2-1-2      Corporate Powers
2-1-3      Duties of Office (Ord No. 09-29)
2-1-4      Vacancies in Council (Ord. No. 08-19)
2-1-5      Compensation (Ord 89-08/09-14)(Res 96-04/99-09)
2-1-6      Oath of Office
2-1-7      Bond
2-1-8      Financial Disclosure Statement
2-1-9      Absence of Council Members (Ord 08-17)
2-1-10     Qualification of Council Candidates (Ord 09-15)

**Section      2-1-1          Elected Officers**

The elected officers of the town shall be seven Council Members, one of whom shall be designated as Mayor in accordance with Section 2-2-1.  The Mayor and Council Members shall constitute the Council and shall continue in office until assumption of duties of office by their duly elected or appointed successors.  Council Members shall serve four years overlapping terms in the manner provided by state statute.

**Section      2-1-2          Corporate Powers**

The corporate powers of the town shall be vested in the Council and shall be exercised only as directed or authorized by law.  All powers of the Council shall be exercised by ordinance, resolution, order or motion.

**Section      2-1-3          Duties of Office (Ord No. 09-29)**

Council Members shall assume the duties of office at the regularly scheduled Council meeting next following the date of the general election at which, or effective as of the date of which, the Council Members were elected. Mayor and Council Members will abide by the Quartzsite Town Council Procedure and Legal and Ethical Standards (Quartzsite Town Council Procedure Policy) of Conduct Manual.

**Section      2-1-4          Vacancies in Council (Ord. No. 08-19)**

A. The Council shall fill a vacancy that may occur by either of the following:
    1.  Appointment for the unexpired term.
    2.  Appointment until the next regularly scheduled Council election if the vacancy
       occurs more than thirty days before the nomination petition deadline.
B. The member appointed shall meet the qualifications established in A.R.S. §9-232.

**Section      2-1-5          Compensation** (Ord 89-08/09-14)(Res 96-04/99-09)

A.     Compensation of the Town Code of Quartzsite, sets forth that the compensation
       of elected officers may be fixed from time to time by resolution of Council.  It is
       expressly understood that said increases shall be effected at the earliest possible
       date.

       That monthly compensation (STIPEND) for the Mayor is hereby set at $500.00
       and the monthly compensation (STIPEND) for each Council Member is hereby
       set at $400.00.

B.     That Council's monthly stipend be pro-rated on a daily basis for the month
       (EITHER MARCH, MAY, SEPTEMBER, NOVEMBER DEPENDING UPON
       RECEIVING THE MAJORITY OF VOTES DURING A PRIMARY ELECTION,
       SEE SUBSECTION 2-2-1 AND 2-3-1) their seat is in question by election, to be
       paid one-half after each regularly scheduled Council Meeting for that month.

       That if the Mayor or a Council Member leaves office prior to the last day of a
       month or takes office after the first day of the month, their compensation shall be
       prorated on a daily basis and they should be paid for only those days of the
       month which he or she serves.

C.     THAT EACH COUNCIL MEMBER'S MONTHLY STIPEND PAYMENT SHALL BE
       PAID IN INSTALLMENTS OF ONE-HALF AFTER EACH REGULARLY
       SCHEDULED COUNCIL MEETING.  EACH PAYMENT SHALL BE
       DEPENDENT AND CONDITIONED UPON HIS/HER ATTENDANCE EITHER IN
       PERSON OR TELEPHONICALLY AT EACH REGULARLY SCHEDULED
       COUNCIL MEETINGS, UNLESS SUCH ABSENCE IS EXCUSED BY THE
       MAYOR.

**Section      2-1-6          Oath of Office**

Immediately prior to assumption of the duties of office, each Council Member shall, in
public, take and subscribe to the oath of office.

**Section      2-1-7          Bond**

Prior to taking office, every Council Member shall execute and file an official bond,
enforceable against the principal and his sureties, conditioned on the due and faithful
performance of his official duties, payable to the state and to and for the use and benefit
of the town or any person who may be injured or aggrieved by the wrongful act or
default of such officer in his official capacity.  A person so injured or aggrieved may
bring suit on such bond under provisions identical to those contained in A.R.S. § 38-
260.  Bonds shall be in such sum as shall be provided by resolution, and the premium
for such bonds shall be paid by the town.

**Section      2-1-8          Financial Disclosure Statement** (Res 89-06)

The Mayor and each Council Member shall file by January 31 of each year a financial disclosure statement in a form and with such information as provided by resolution of the Council.

**Section      2-1-9          Absence of Council Members** (Ord 08-17)

A Council Member shall not absent himself/herself from the Town for a greater period than thirty days without the consent of the Council.

**Section      2-1-10         Qualifications of Council Candidates** (Ord 09-15)

A.   The Town Council shall judge the elections, qualifications, and returns of its members pursuant to A.R.S. §9-234.  Such qualifications shall not only include those contained within Title 16 of the Arizona Revised Statutes, but also any contained within this Quartzsite Town Code.

B.   The qualifications for eligibility of Mayor or Council candidates for election to these positions includes the requirement that no delinquent or fixed fines and penalties, user fees, permit fees, and sales tax be owed to the Town of Quartzsite at the time of declaration of candidacy.

C.   Council Members, candidates, and appointees for Town elected and appointed office shall be held to certain standards of conduct, which include compliance with all federal, state, and local laws, rules and regulations (i.e. to include, but not exclusive of, Arizona State standards of conduct for public officials, conflict of interest, open meetings laws, etc.).

D.   Failure to comply with this ordinance shall result in ineligibility of the candidate or elected official seeking re-election to be qualified to run or be appointed to Town office.

E.   Appointed official to Town offices of Manager, Attorney, Town Clerk, and Magistrate shall be held to the same standards and shall not be qualified to hold appointed positions.

**ARTICLE      2-2      MAYOR**

2-2-1         Direct Election of Mayor
2-2-2         Vice Mayor
2-2-3         Acting Mayor
2-2-4         Powers and Duties of the Mayor (Ord 10-06)
2-2-5         Absence of Mayor
2-2-6         Failure to Sign Documents

**Section      2-2-1          Direct Election of Mayor** (Ord 91-05)

A.   Commencing with the primary and the general election of the town in 1992, the Mayor shall be directly elected by the people by a majority vote of the qualified electors.

B.    The term of the Mayor shall be for four years.

C.    Any candidate who shall receive at the primary election, held by the town, a majority of all votes cast for Mayor at such primary election, shall be declared to be elected to the office of Mayor effective as of the date of the general election for the town and said candidate shall not be required to run for Mayor at the general election.

D.    A candidate cannot run for both Mayor and Council Member at the same election.

E.    Council Members who desire to run for Mayor must resign their position on the Council as of the day they submit their nomination papers, unless they are in the last year of their term.

F.    All other provisions of this code or Arizona Revised Statutes dealing with municipal elections are hereby declared to be applicable to the direct election of the Mayor for the town.

**Section    2-2-2    Vice Mayor**

The Council shall designate one of its members as Vice Mayor, who shall serve at the pleasure of the Council. The Vice Mayor shall perform the duties of the Mayor during his absence or disability.

**Section    2-2-3    Acting Mayor**

In the absence or disability of both the Mayor and Vice Mayor, the Council may designate another of its members to serve as acting Mayor who shall have all the powers, duties and responsibilities of the Mayor during such absence or disability.

**Section    2-2-4    Powers and Duties of the Mayor** (Ord 10-06)

The powers and duties of the Mayor shall include the following:

A.    He shall be the chief executive officer of the town.
B.    He shall be the chairman of the Council and preside over its meetings. He may make and second motions and shall have a voice and vote in all its proceedings.
C.    He shall enforce the provisions of this code.
D.    He shall execute and authenticate by his signature such instruments as the Council or any statutes, ordinances or this code shall require.
E.    He shall make such recommendations and suggestions to the Council as he may consider proper.
F.    The Mayor and Council may, by proclamation, declare a local emergency to exist due to fire, conflagration, flood, earthquake, explosion, war, bombing or any other natural or man-made calamity or disaster or in the event of the threat or occurrence of riot, rout or affray or other acts of civil disobedience which endanger life or property

within the town.  After declaration of such emergency, the Mayor and Council shall govern by proclamation and impose all necessary regulations to preserve the peace and order of the town, including but not limited to:

1.  Imposition of a curfew in all or any portion of the town.
2.  Ordering the closing of any business.
3.  Closing to public access any public building, street or other public place.
4.  Calling upon regular or auxiliary law enforcement agencies and organizations within or without the political subdivision for assistance.

G.    He shall perform such other duties required by state statute and this code as well as those duties required as Chief Executive Officer of the town.

**Section      2-2-5          Absence of Mayor (Ord 07-19)**

The Mayor shall not absent himself from the town for a greater period than thirty (30) days without the consent of the Council.

**Section      2-2-6          Failure to Sign Documents**

If the Mayor refuses or fails to sign any ordinance, resolution, contract, warrant, demand or other document or instrument requiring his signature for five days consecutively, then a majority of the members of the Council may, at any regular or special meeting, authorize the Vice Mayor or, in his absence, an acting Mayor to sign such ordinance, resolution, contract, warrant, demand or other document or instrument which when so signed shall have the same force and effect as if signed by the Mayor.

**ARTICLE      2-3      COUNCIL ELECTION**

|  |  |
|---|---|
| 2-3-1 | Primary Election |
| 2-3-2 | Non-Political Ballot |
| 2-3-3 | General Election Nomination |
| 2-3-4 | Election to Office |
| 2-3-5 | Candidate Financial Disclosure |
| 2-3-6 | Election Dates |

**Section      2-3-1          Primary Election**

Any candidate who shall receive at the primary election a majority of all the votes cast shall be declared to be elected to the office for which he is a candidate effective as of the date of the general election, and no further election shall be held as to said candidate; provided that if more candidates receive a majority than there are offices to be filled then those equal in number to the offices to be filled receiving the highest number of votes shall be declared elected.

**Section        2-3-2             Non-Political Ballot**

Nothing on the ballot in any election shall be indicative of the support of the candidate.

**Section        2-3-3             General Election Nomination**

If at any primary election held as above provided there be any office for which no candidate is elected, then as to such office, said election shall be considered to be a primary election for nomination of candidates for such office, and the second or general municipal election shall be held to vote for candidates to fill such office.  Candidates to be placed on the ballot at the general municipal election shall be those not elected at the primary election and shall be equal in number to twice the number to be elected to any given office or less than that number if there be less than that number named on the primary election ballot.  Persons who receive the highest number of votes for the respective offices at such first election shall be the only candidates at such second election, provided that if there be any person who, under the provisions of this article, would have been entitled to become a candidate for any office except for the fact that some other candidate received an equal number of votes therefor, then all such persons receiving an equal number of votes shall likewise become candidates for such office.

**Section        2-3-4             Election to Office**

The candidates equal in number to the persons to be elected who receive the highest number of votes shall be declared elected.

**Section        2-3-5             Candidate Financial Disclosure** (Res 89-06)

Each candidate for the office of Council Member shall file a financial disclosure statement when such candidate files a nomination paper.  The statement shall contain such information as required by resolution of the Council.

**Section        2-3-6             Election Dates** (Ord 93-10)

The primary election shall be held on the second Tuesday of March of every even-numbered year.  The date for the general election shall be the third Tuesday of May of every even-numbered year.

**ARTICLE    2-4     COUNCIL PROCEDURE**

| | |
|---|---|
| 2-4-1 | Regular Meetings |
| 2-4-2 | Special Meetings |
| 2-4-3 | Meetings to be Public |
| 2-4-4 | Quorum |
| 2-4-5 | Agenda (Ord 10-06) |
| 2-4-6 | Order of Business (Ord 92-08)(Ord 92-08)(Ord 02-06)(Ord 08-22)(Ord 10-18) |
| 2-4-7 | Boards, Committees, and Commissions |

|          |       |                    |
|----------|-------|--------------------|
| 2-4-8    |       | Voting             |
| 2-4-9    |       | Suspension of Rules |

**Section      2-4-1        Regular Meetings** (Ord 89-05)(Ord92-07)(Ord 02-05)(Ord 11-11)

The Council Shall hold regular meetings on the second and fourth Tuesday of each month at 9:00 A.M., except when the day fixed for any regular meeting of the Common Council falls upon a day designated by law as a legal holiday, such meeting shall be held at the same hour on the next succeeding day not a holiday unless otherwise noticed by the Town. All regular meetings of the Council shall be held at the location specified in the Notice of Meeting.

**Section      2-4-2        Special Meetings** (Ord 89-05)(Ord 11-11)

The Mayor may convene the Common Council at any time after giving twenty-four (24) hours notice of such meeting to Members of the Common Council and the general public.  The agenda of any such meeting shall be subject to the approval of a majority of the Members of the Common Council and any special meeting called by the Mayor shall not proceed in the absence of a quorum and approval of one or more agenda items by a majority of the Common Council.

The Common Council may, upon written request of three of its number, convene a meeting thereof at any time after giving twenty-four (24) hors notice of such meeting to the Mayor and other Members of the Common Council and the general public.  The agenda of any such meeting shall be subject to the approval of a majority of the Members of the Common Council and any special meeting called upon the written request of three Common Council Members shall not proceed in the absence of a quorum and approval of one or more agenda items by a majority of the common Council.

**Section      2-4-3        Meetings to be Public**

All proceedings of the Council shall be open to the public, except that upon approval by a majority vote of the Council, the Council may meet in a closed executive session pursuant to the provisions of state law.  Notice of meetings shall be given in a manner consistent with state statutes.

**Section      2-4-4        Quorum**

A majority of the Council shall constitute a quorum for transacting business, but a lesser number may adjourn from time to time and compel the attendance of absent members.

**Section      2-4-5        Agenda** (Ord 10-06)

Prior to each Council meeting, or on or before a time fixed by the Council for preparation and distribution of an agenda, whichever is earlier, the Town Clerk shall collect all written reports,

communications, ordinances, resolutions, contracts and other documents to be submitted to the Council, prepare an agenda according to the order of business and furnish each Council Member, the Mayor and the Town Attorney with a copy of the agenda and any material pertinent thereto. Any member of the Town Council may request that items be placed on the Town Council's agenda for consideration, discussion and legal action by submitting a written request to the Town Clerk's office prior to the deadline for the specified agenda. All communication should be addressed to Council as a whole and not to any individual member thereof.

**Section     2-4-6          Order of Business** (Ord 92-06)(Ord 92-08)(Ord 02-06)(Ord 08-22)(Ord 10-18)

- ➤ **CALL TO ORDER –** The presiding officer shall remind persons present to turn off all cell phones.
- ➤ **INVOCATION –** The Invocation shall be given on a rotating basis. Clergy present at the Council meeting or by a member of the Council.
- ➤ **PLEDGE OF ALLEGIANCE –** The Pledge shall be led by selected member of Council.
- ➤ **ROLL CALL OF THE COUNCIL**
- ➤ **REPORTS AND ANNOUNCEMENTS –** All announcements and reports must by pertinent to Town business, Town charitable or non-profit events and may not include commercial statements, political or personal news. All reports and announcements must be placed on the agenda.
- ➤ **CONSENT AGENDA –** Consent agenda items are generally non-discussion items. A Council Member may request an item to be removed from the consent agenda for discussion and a separate action on the item.
- ➤ **NEW BUSINESS –** For items that include public comment, the item shall so state on the agenda. Public comments shall be limited to four (4) minutes per person. The Town Clerk shall maintain the clock. For each agenda item, the staff may explain the item or issue before the motion is made. Council discussion follows the motion.
- ➤ **OLD BUSINESS –** For any items that include public comment, the item shall so state on the agenda. Public comments shall be limited to four (4) minutes per person. The Town Clerk shall maintain the clock. For each agenda item, the staff may explain the item before the motion is made. Council discussion follows the motion.
- ➤ **CITIZEN COMMENTS (call to the public) –** Each citizen is limited to four (4) minutes and must stand at the podium and state their name for the record. The clerk shall maintain the clock. Personal attacks, personal comments, political comments or commercial comments shall not be allowed. One person may not assign their time to another person. If there are several speakers on a particular matter, they should select a person to make the presentation on their behalf. Citizens shall observe rules of propriety, decorum and good conduct. Profanity, threatening or personal attacks and slanderous remarks are not permitted. If such behavior does not cease at the request of the Mayor or a Council Member, the individual may be barred from

further audience before the Council for the remainder of that meeting and the next general meeting unless permission is granted by a majority vote of the Council. Public officials and Town staff may respond to criticism or request staff to review a matter or place on the agenda

**Section       2-4-7           Boards, Committees and Commissions** (Ord 96-06)

The Mayor shall create such boards, committees and commissions, standing or special as deemed necessary.  The Mayor and Council, by a simple majority at a properly noticed public meeting, has the right to appoint members thereto.  Boards, committees and commissions shall perform such duties as the Mayor and Council prescribe.

**Section       2-4-8           Voting**

A.    The Mayor shall vote as a member of the Council.
B.    Upon the request of any member, the ayes and nays upon any question shall be taken and entered in the minutes.

**Section       2-4-9           Suspension of Rules**

Any provisions of this article may be temporarily suspended in connection with any matter under consideration by a recorded vote of three-fourths of the members present, except that this section shall not be construed to permit any action that is contrary to state statutes.

**ARTICLE      2-5     ORDINANCES, RESOLUTIONS AND CONTRACTS**

| | |
|---|---|
| 2-5-1 | Prior Approval |
| 2-5-2 | Introduction |
| 2-5-3 | Reading of Proposed Ordinance |
| 2-5-4 | Requirements for an Ordinance |
| 2-5-5 | Effective Date of Ordinances |
| 2-5-6 | Signatures Required |
| 2-5-7 | Publishing Required |
| 2-5-8 | Posting Required |

**Section       2-5-1           Prior Approval**

All ordinances, resolutions and contracts documents shall, before presentation to the Council, have been reviewed as to form by the attorney and shall, when there are substantive matters of administration involved, be referred to the person who is charged with the administration of the matters.  Such person shall have an opportunity to present his comments, suggestions and objections, if any, prior to the passage of the ordinance, resolution or acceptance of the contract.

**Section       2-5-2           Introduction**

Ordinances, resolutions and other matters or subjects requiring action by the Council shall be introduced and sponsored by a member of the Council, except that the attorney, the manager or the clerk may present ordinances, resolutions and other matters or subjects to the Council, and any member of the Council may assume sponsorship thereof by moving that such ordinance, resolution, matter or subject be adopted; otherwise, they shall not be considered.

**Section       2-5-3            Reading of Proposed Ordinance** (Ord 93-10)

All Ordinances shall have at least one reading.  This reading may be by title only, if the Council is in possession of printed copies of said ordinance.  Upon the request of any member of the Council, the ordinance shall be read in full.

**Section       2-5-4            Requirements for an Ordinance**

Each ordinance should have but one subject, the nature of which is clearly expressed in the title.  Whenever possible, each ordinance shall be introduced as an amendment to this code or to an existing ordinance, and, in such case, the title of the sections to be amended shall be included in the ordinance.

**Section       2-5-5            Effective Date of Ordinances**

No ordinance, resolution or franchise shall become operative until thirty days after its passage by the Council and approval by the Mayor, except measures necessary for the immediate preservation of the peace, health or safety of the town, but such an emergency measure shall not become immediately operative unless it states in a separate section the reason why it is necessary that it should become immediately operative, and unless it is approved by the affirmative vote of three-fourths of all the members elected to the Council, taken by ayes and nays and approved by the Mayor.

**Section       2-5-6            Signatures Required**

Every ordinance passed by the Council shall, before it becomes effective, be signed by the Mayor and attested by the clerk.

**Section       2-5-7            Publishing Required**

Only such orders, resolutions, motions, regulations or proceedings of the Council shall be published as may be required by state statutes or expressly ordered by the Council.

**Section       2-5-8            Posting Required** (Res 90-18)(Res 94-19)(Res 99-18)

Every ordinance imposing any penalty, fine, forfeiture or other punishment shall, after passage, be posted by the clerk in three or more public places within the town and an

affidavit of the person who posted the ordinance shall be filed in the office of the clerk as proof of posting.

**ARTICLE   2-6   INITIATIVE AND REFERENDUM** (Ord 90-20)

| | |
|---|---|
| 2-6-1 | Power Reserved; Time of Election |
| 2-6-2 | Number of Signatures |
| 2-6-3 | Time of Filing |
| 2-6-4 | Sample Ballots and Publicity Pamphlets |

**Section   2-6-1   Power Reserved; Time of Election**

There is reserved to the qualified electors of the town the power of the initiative and the referendum as prescribed by the state constitution.  Any initiative or referendum matter shall be voted on at the next ensuing primary or general election, or at a special election called by the Council for such purpose.

**Section   2-6-2   Number of Signatures**

A.   The total number of registered voters qualified to vote at the last municipal election, whether regular or special, immediately preceding the date upon which any initiative petition is filed shall be the basis upon which the number of qualified electors of the town required to file an initiative petition shall be computed.

B.   The basis upon which the number of qualified electors of the town required to file a referendum petition shall be as determined by state law.

**Section   2-6-3   Time of Filing**

A.   Initiative petitions shall be filed at least 120 days prior to the election at which they are to be voted upon.

B.   Referendum petitions shall be filed within thirty days of the adoption of the ordinance or resolution.  If the town clerk is unable to provide petitioners with a copy of the ordinance of resolution at the time of application for an official number or on the same business day of the application, the thirty day period shall be calculated from the date such ordinance or resolution is available.

**Section   2-6-4   Sample Ballots and Publicity Pamphlets**

The following procedures relating to sample ballots and publicity pamphlets are hereby adopted for conducting elections at which an initiative or referendum is to be voted upon:

A.   A publicity pamphlet, containing the entire text of the official ballots, shall be mailed by the town clerk to each household within the town in which a registered voter resides, not less than ten days prior to the election to which the sample ballot pertains.

B.    The pamphlet shall contain the proposition as it will appear on the ballot together with a summary of each proposition. Each summary shall be followed by any arguments supporting the proposition followed by any arguments opposing the proposition.

C.    Arguments supporting and opposing proposition appearing on the ballot shall be filed with the office of the Town Clerk by 5:00 p.m. not less than sixty days prior to the election at which the propositions are to be voted upon. Arguments supporting or opposing propositions appearing on the ballot shall meet the following requirements.

    1.    Arguments must relate to the proposition proposed by initiative or referred by referendum which will appear on the ballot.

    2.    Arguments must identify the proposition to which they refer and indicate whether the argument is in support of or opposition to the proposition.

    3.    Arguments may not exceed three hundred words in length.

    4.    Arguments must be signed by the person or persons who submit them. Arguments submitted by organizations shall be signed on behalf of the organization by an officer of the organization authorized to take such action. All persons signing documents shall indicate their residence or post office address.

    5.    No person or organization shall submit more than one argument for each proposition to be voted upon.

    6.    Each argument shall be accompanied by a deposit in the amount of $100.00 to offset proportional costs of printing. This requirement shall not be waived on any account.

EXHIBIT 10

MINUTES
TOWN OF QUARTZSITE
SPECIAL MEETING OF THE COMMON COUNCIL
MONDAY, JUNE 4, 2012, 9:00 AM

**CALL TO ORDER:** 9:00 AM by Mayor Lizarraga

**INVOCATION:** Pastor Aaron

**PLEDGE OF ALLEGIANCE:** All in attendance. Led by Council Member Winslow

**ROLL CALL:**
Mayor Lizarraga, Vice Mayor Cowell by telephone, Council Member Anderson, Council Member Jewitt, Council Member Kelley, Council Member Winslow and Council Member Crooks

**ABSENT:**

**STAFF PRESENT:** Town Manager Taft , Assistant Town Manager Johnson, Town Attorney Brannan, Planning and Zoning Director Yackley and Deputy Town Clerk Nelson

**APPROVAL/AMENDMENT OF AGENDA:**
Council Member Jewitt motioned to approve the agenda amending that the Consent Agenda Items be placed before the New Business, second by Council Member Winslow. Mayor Lizarraga called for the vote. Vote seven (7) in favor. MOTION CARRIED

**APPROVAL/AMENDMENT OF AGENDA:**
Council Member Anderson had no community report.

**CONSENT AGENDA:**
1. Approval of Minutes of Regular Meeting of May 22, 2012
2. Approval of Minutes of Special Meeting of May 23, 2012

Motion by Council Member Winslow to approve Consent Agenda items 1 & 2, second by Council Member Kelley. Mayor Lizarraga called for the vote. Vote – Seven (7) in favor. MOTION CARRIED

**NEW BUSINESS:**
**060412 – 1.** Approve the canvass of the May 15, 2012 runoff election pursuant to A.R.S. § 16-642(A).

Motion by Council Member Jewitt, second by Council Member Kelley. Town Manager Taft asks Members of the Council if they would like to find out the results of the election

investigation at this time. Council Member Anderson would like to hear the report. Town Manager Taft explained that at this time the investigation is still ongoing and that there are 168 ballots that are being looked further into. Mayor Lizarraga called for the vote. Vote – Seven (7) in favor. MOTION CARRIED

**060412 – 2.** Judge the qualifications of Ed Foster, Mayor-Elect pursuant to A.R.S. §§ 9-232 and 9-234(A) and Town Code § 2-1-10.

Council Member Anderson motioned to recess into executive session to seek legal advice, second by Council Member Jewitt. Mayor Lizarraga called for the vote. Vote - Seven (7) in favor. MOTION CARRIED. Council recessed into executive session at 9:09 am.

Council reconvenes at 9:40 AM. Mayor Lizarraga, Vice Mayor Cowell by telephone, Council Member Anderson, Council Member Jewitt, Council Member Kelly, Council Member Winslow and Council Member Crooks. Staffs present are Town Manager Taft, Assistant Town Manager Johnson, Town Attorney Brannan, Planning and Zoning Director Yackley and Deputy Town Clerk Nelson.

Motion by Council Member Winslow to find that Ed Foster is not qualified to serve as Mayor-Elect pursuant to A.R.S. §§ 9-232 and 9-234 (A) and Town Code § 2-1-10, second by Council Member Jewitt. Mayor Lizarraga called for the vote. Vote – Six (6) in favor, One (1) opposed. MOTION CARRIED

**060412 – 3.** Judge the qualifications of Mark Orgeron, Council Member-Elect pursuant to A.R.S. §§ 9-232 and 9-2.34(A) and Town Code § 2-1-10.

Council Member Winslow motioned to recess into executive session to seek legal advice, second by Council Member Kelley. Mayor Lizarraga called for the vote. Vote - Seven (7) in favor. MOTION CARRIED. Council recessed into executive session at 9:44 AM.

Council reconvenes at 10:17 AM. Mayor Lizarraga, Vice Mayor Cowell by telephone, Council Member Anderson, Council Member Jewitt, Council Member Kelly, Council Member Winslow and Council Member Crooks. Staffs present are Town Manager Taft, Assistant Town Manager Johnson, Town Attorney Brannan, Planning and Zoning Director Yackley and Deputy Town Clerk Nelson.

Motion by Council Member Winslow to find that Mark Orgeron is not qualified to serve as Council Member-Elect pursuant to A.R.S. §§ 9-232 and 9-234 (A) and Town Code § 2-1-10, second by Council Member Crooks. Mayor Lizarraga called for the vote. Vote - Five (5) in favor, two (2) opposed. MOTION CARRIED. [1]

---

[1] Although the clerk only heard one nay and the audio recording only picked up one nay by Mayor Lizarraga, Council Member Kelley indicated that she had in fact voted nay as well.

**060412 – 4.** Judge the qualifications of Patricia Workman, Council Member-Elect pursuant to A.R.S. §§ 9-232 and 9-234 (A) and Town Code § 2-1-10.

Council Member Crooks motioned to recess into executive session to seek legal advice, second by Council Member Winslow. Mayor Lizarraga calls for the vote. Vote – Seven (7) in favor. MOTION CARRIED Council recessed into executive session at 10:20 AM.

Council reconvenes at 10:34 AM. Mayor Lizarraga, Vice Mayor Cowell by telephone, Council Member Anderson, Council Member Jewitt, Council Member Kelly, Council Member Winslow and Council Member Crooks. Staffs present are Town Manager Taft, Assistant Town Manager Johnson, Town Attorney Brannan, Planning and Zoning Director Yackley and Deputy Town Clerk Nelson.

Motion by Council Member Winslow to find that Patricia Workman is qualified to serve as Council Member-Elect pursuant to A.R.S. §§ 9-232 and 9-234 (A) and Town Code § 2-1-10, second by Council Member Jewitt. Mayor Lizarraga calls for the vote. Vote – Seven (7) in favor. MOTION CARRIED.

Mayor Lizarraga asked Town Attorney Brannan if Council Member Winslow will be stepping down at this time and Town Attorney Brannan explained that Council Member Winslow will be stepping down.

ADJOURNMENT:
10:35 AM

CERTIFICATION:
    I hereby certify that the foregoing minutes are a true and correct copy of the minutes of the Special Meeting of the Town Council of Quartzsite, Arizona, held on the 4th day of June 2012.
    I further certify that the meeting was duly called and held and that a quorum was present.
        DATED this 12th day of June 2012.

                                                    _____
                                                    Terry Frausto, Town Clerk

APPROVED:

_____
Jose Lizarraga, Mayor

EXHIBIT 11

**PUBLIC NOTICE**

Notice of Regular Meeting
Town of Quartzsite Common Council
Tuesday, June 12, 2012, 9:00 AM

IN ACCORDANCE WITH TOWN CODE SECTION 2-4-1 AND ARIZONA REVISED
STATUTES SECTION § 38-431.02,

NOTICE IS HEREBY GIVEN TO MEMBERS OF THE QUARTZSITE COMMON
COUNCIL AND TO THE GENERAL PUBLIC THAT THE COMMON COUNCIL OF THE
TOWN OF QUARTZSITE, ARIZONA, WILL HOLD A REGULAR MEETING OPEN TO
THE PUBLIC ON TUESDAY,  JUNE 12, 2012 AT 9:00 AM, AT THE QUARTZSITE
MUNICIPAL CENTER, 465 N. PLYMOUTH AVE., ¼ MILE NORTH OF MAIN STREET
(B-10).  SEE AGENDA WHICH IS ATTACHED HERETO AND INCORPORATED
HEREIN.  **MEMBER(S) OF THE COMMON COUNCIL WILL ATTEND EITHER IN
PERSON OR BY TELEPHONE CONFERENCE CALL.**

INFORMATION CONCERNING THE COUNCIL'S AGENDA FOR THE MEETING MAY
BE REVIEWED AT THE QUARTZSITE MUNICIPAL CENTER.  THE PUBLIC MAY
OBTAIN A COPY OF THE AGENDA DURING REGULAR BUSINESS HOURS AT THE
QUARTZSITE MUNICIPAL CENTER, 465 N. PLYMOUTH AVE., ¼ MILE NORTH OF
MAIN STREET (B-10), QUARTZSITE, ARIZONA.

Terry Frausto, Town Clerk

DATE POSTED:     June 8, 2012
TIME POSTED:     12:00 Noon


**PERSONS WITH DISABILITIES OR THOSE WHO REQUIRE SPECIAL
ACCOMMODATIONS PLEASE CONTACT TERRY FRAUSTO AT 928-927-4333 IN
ADVANCE OF THE MEETING**

**COUNCIL MAY NOT ACT ON ITEMS NOT ON THE AGENDA**
**ENHANCED SECURITY MEASURES ARE IN PLACE WHICH MAY DELAY ENTRY
INTO TOWN HALL, SO ATTENDEES MAY WISH TO COME TO TOWN HALL
EARLIER THAN USUAL.**

**NO WEAPONS OF ANY KIND MAY BE BROUGHT INTO TOWN HALL.**

**AGENDA**
**TOWN OF QUARTZSITE**
**REGULAR MEETING OF THE COMMON COUNCIL**
**TUESDAY, JUNE 12, 2012 9:00 AM**

<u>**CALL TO ORDER:**</u>

<u>**INVOCATION:**</u>

<u>**PLEDGE OF ALLEGIANCE:**</u>

<u>**ROLL CALL:**</u>
Mayor Lizarraga                          Vice Mayor Cowell
Council Member Anderson            Council Member Jewitt
Council Member Kelley               Council Member Workman
Council Member Crooks

<u>**APPROVAL/AMENDMENT OF AGENDA:**</u>

<u>**REPORTS & ANNOUNCEMENTS:**</u>
Community Report – Council Member Anderson
Manager's Report – Town Manager Taft

<u>**CONSENT AGENDA:**</u>
1. Approval of accounts payable (Check Series 33821 - 33905 /total = $534,717.78).
2. Approval of Minutes of Special Meeting June 4, 2012.

<u>**NEW BUSINESS:**</u>
**061212 – 1** Discussion only regarding proposal from Shaun O'Hollaren concerning a possible television program featuring Quartzsite.
(Not open for public discussion)

<u>**ADJOURNMENT:**</u>
**REGARDING ANY OF THE AGENDA ITEMS, PURSUANT TO A.R.S. §38-431.03(A)(2), §38-431.03(A)(3) AND §38-431.03(A)(4), NOTICE IS HEREBY GIVEN TO THE TOWN COUNCIL AND THE GENERAL PUBLIC THAT THE COUNCIL MAY VOTE TO GO INTO EXECUTIVE SESSION, WHICH WILL NOT BE OPEN TO THE PUBLIC, FOR THE PURPOSE OF DISCUSSION OF PERSONNEL MATTERS, DISCUSSION OR CONSIDERATION OF RECORDS EXEMPT BY LAW FROM PUBLIC INSPECTION, FOR OBTAINING LEGAL ADVICE FROM IT'S ATTORNEY(S), OR FOR DISCUSSION OR CONSULTATION WITH IT'S ATTORNEY(S) IN ORDER TO CONSIDER IT'S POSITION AND INSTRUCT IT'S ATTORNEY(S) REGARDING PENDING OR CONTEMPLATED LITIGATION.**

**PERSONS WITH DISABILITIES OR THOSE WHO REQUIRE SPECIAL ACCOMMODATIONS PLEASE CONTACT TERRY FRAUSTO AT 928-927-4333 IN ADVANCE OF THE MEETING**

**COUNCIL MAY NOT ACT ON ITEMS NOT ON THE AGENDA**